UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| VALBRUNA SLATER STEEL CORP. | ) | |
| and FORT WAYNE STEEL CORP., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:10-CV-044 JD |
| | ) | |
| JOSLYN MANUFACTURING CO., *et* | ) | |
| *al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiffs Valbruna Slater Steel Corporation and Fort Wayne Steel Corporation (collectively "Valbruna") sued defendants Joslyn Manufacturing Company, *et alia*, ("Joslyn") on February 11, 2010. [DE 1].[1] Valbruna is the current owner of a parcel of land near Fort Wayne, Indiana, which Joslyn occupied until 1981. Valbruna is currently engaged in remedial efforts at the site in cooperation with the Indiana Department of Environmental Management ("IDEM"). Valbruna's complaint essentially blames Joslyn for the contamination at the site, and alleges three counts: (1) a cost recovery action under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a); (2) a similar action under the Indiana Environmental Legal Actions statute; and (3) a declaratory judgment of the defendant's future liability. Joslyn's first move was to attempt to preclude the suit based on earlier state court litigation with Valbruna's predecessor in interest. This court found that the Indiana ELA claim was precluded, but that the federal claims survived. [DE 35; DE 39]. On January 13, 2012, Joslyn moved for

---

[1] The record is cited in the following format: ["Docket Entry Number" at "page or paragraph number within docket entry"].

1

summary judgment against Valbruna's remaining claims, arguing that they are barred by the statute of limitations. On March 14, 2012, Valbruna responded, and moved to strike certain exhibits supporting Joslyn's motion. On March 28, 2012, the briefing was completed, and the motions have been under advisement. Having considered the law and the facts of this case, the court now denies Joslyn's motion for summary judgment [DE 42], and denies Valbruna's motion to strike [DE 47], for the reasons discussed in this order.

## STANDARD OF REVIEW

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any such material fact, and summary judgment is therefore inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id*. On the other hand, where a factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party, as well as draw all reasonable and justifiable inferences in her favor. *Anderson*, 477 U.S. at 255; *King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). Still, the non-moving party cannot simply rest on the allegations or

denials contained in its pleadings. It must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Furthermore, the non-moving party may rely only on admissible evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009).

The issue presented in this case is particularly appropriate for resolution at the summary judgment stage. Not only are the material facts undisputed [DE 49 at 1], but the primary issue is whether certain work undertaken by the plaintiff's predecessor in interest in the 1980s and 1990s was a "remedial action" or a "removal action" under CERCLA. That is a question of law. *Cytec Industries, Inc. v. B.F. Goodrich Co.*, 232 F.Supp.2d 821, 832 (S.D. Ohio 2002); *OBG Technical Services, Inc. v. Northrup Grumman Space & Mission Sys. Corp.*, 503 F.Supp.2d 490, 524 (D.Conn. 2007).

## BACKGROUND[2]

From 1928 to 1981, defendant Joslyn Manufacturing Company owned and operated a steel mill at 2302 and 2400 Taylor Street in Fort Wayne, Indiana (collectively "the Site"). [DE 28-1 at 1; DE 28-2 at 11-13]. During Joslyn's tenure, steel mill operations polluted the Site's soil and groundwater with chlorinated solvents, metals, and other contaminants. On February 2, 1981, Joslyn sold the Site to Slater Steels Corporation ("Slater"). In connection with the sale, the two companies signed an Asset Purchase Agreement ("APA") in which Joslyn agreed to indemnify Slater for certain

---

[2] This section is not meant to be an exhaustive catalogue of every fact or piece of evidence presented to the court. It is simply meant to provide a brief narrative of the events underlying the case. The inclusion of a fact in this section does not mean that it is material, and the exclusion of a fact does not mean that it is immaterial, or that the court did not consider it. The court will recount particularly relevant facts where appropriate in the discussion section.

costs and expenses. [DE 20-1 at 19-22].

From 1981 to 1987, Slater excavated sludge and metal-contaminated soil from two areas of the Site: (1) Joslyn's former surface impoundment (located in the far northeast corner of the Site) and (2) Joslyn's former waste pile (located in the far northwest corner of the site). [DE 46-6 ¶ 3]. The excavation did not remove all of the contaminants from the former surface impoundment, so additional action was necessary. [DE 46-6 ¶ 4]. In 1988, Slater signed a Consent Agreement and Final Order with the United States Environmental Protection Agency ("EPA") obligating Slater to monitor groundwater at the Site until the Indiana Department of Environmental Management ("IDEM") could certify the clean closure of the polluted areas under excavation. [DE 46-7 at 8].

In 1991, Slater filled the excavated area at the surface impoundment with clean, compacted soil, constructed a reinforced-concrete cap over the impoundment area, and implemented a groundwater detection monitoring program. [DE 42-7 at 36]. On January 19, 1996, Slater submitted an application to the Indiana Department of Environmental Management ("IDEM") Voluntary Remediation Program. [DE 42-5]. The application noted that the site investigation was complete, and that the site remediation was complete. [DE 42-5]. On February 7, 1996, IDEM accepted the application. [DE 42-8 at 1]. On June 14, 1999, IDEM issued a certificate of completion to Slater concerning their work in the Voluntary Remediation Program. [DE 42-7 at 11]. The certificate did not represent a successful remediation of the entirety of the Site, however. To the contrary, attached documents verified that investigative work was going on elsewhere on Slater's property. It simply acknowledged a successful remediation of the former Joslyn surface impoundment location on the far northeast corner of the Site. On several occasions between 1988 and 1999, Slater sought indemnification under the APA for cleanup costs relating to alleged historical contamination of the

4

Site, but Joslyn denied those requests. [DE 28-6; DE 28-7].

On May 17, 2000, IDEM issued a Notice of Violation ("NOV") to Slater. [DE 46-7]. IDEM had determined that there was a release of trichloroethylene into the environment at the Site, and enclosed a proposed Agreed Order for Slater to sign and return. Among other things, the Agreed Order required Slater to notify IDEM in the event that a "current or potential" threat to human health or the environment developed. [DE 46-7 at 11]. In total, the Agreed Order outlined 45 areas of concern, stemming from various locations on the Site, which Slater was to investigate for potential threats to the environment. [DE 46-7 at 77-82]. On July 17, 2000, Slater filed suit against Joslyn in the Allen County Superior Court, again seeking indemnification. [DE 28-9]. Counts I and II of that suit raised claims of contractual indemnification based on the APA, while Count III brought an ELA claim under Indiana Code §§ 13-30-9-1 *et seq*. [DE 28-9]. On October 30, 2000, Joslyn filed a motion to dismiss Slater's claims. On April 19, 2001, the court denied the motion with respect to Counts I and II, and granted the motion with respect to Count III. Count III was later dismissed with prejudice for a failure to prosecute.

On March 25, 2002, Slater executed and joined in the Agreed Order which IDEM had proposed when it issued the Notice of Violations. [DE 46-10]. On September 11, 2002, Slater provided IDEM with a proposed Remediation Work Plan for the entire Site. [DE 46-13]. But on June 2, 2003, before IDEM could issue final approval, and before Slater could begin work on the Remediation Work Plan for the entire Site, Slater filed a Chapter 11 voluntary bankruptcy petition in the U.S. Bankruptcy Court for the District of Delaware. [DE 28-12]. At auction, Valbruna Slater Stainless Inc., the plaintiffs' corporate parent, purchased the site. In April, 2004, the plaintiffs – Valbruna Slater Steel Corporation and Fort Wayne Steel Corporation (collectively "Valbruna") –

purchased the Site from their parent corporation. In so doing, Valbruna entered into a Prospective Purchaser Agreement ("PPA") with IDEM. The PPA essentially required a $1 million commitment to carry out the work previously contemplated by IDEM in its dealings with Slater pre-bankruptcy.

On May 3, 2005, Valbruna's environmental consultant submitted a Remedial Work Plan to IDEM which laid out a plan to use Electrical Resistance Heating ("ERH") for soil and groundwater remediation of trichloroethylene at the Site. [DE 46-17]. IDEM approved, and the ERH project commenced on May 23, 2005. [DE 46-18 at 7]. Although ERH was successful in eradicating 93.5% of TCE from the soil and groundwater, work at the Site continues with respect to other environmental issues. But since Valbruna acknowledges that remedial efforts began no later than May 23, 2005, cleanup efforts that took place thereafter are not relevant to the purposes of this order.

## DISCUSSION

There are two motions to address: (1) Joslyn's motion for summary judgment [DE 42] and (2) Valbruna's motion to strike certain exhibits supporting that motion. [DE 47]. For the following reasons, the court denies Joslyn's motion for summary judgment, even taking all of the evidence submitted into account. As a result, the motion to strike certain exhibits is denied as moot.

## I.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DE 42]

In 1980, Congress enacted CERCLA in response to the serious environmental and health risks posed by industrial pollution. *Burlington N. and Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (citing *United States v. Bestfoods*, 524 U.S. 51, 55 (1998)). Two CERCLA sections – 42 U.S.C. §§ 9607(a) and 9613(f) – afford rights of action to private parties seeking to recover expenses associated with cleaning up contaminated sites. *See United States v. Atl. Research Corp.*, 551 U.S. 128 (2007). Valbruna is pursuing an action under § 9607(a), the "cost recovery" provision

6

of CERCLA. [DE 1 at 5].[3] A cost recovery action essentially allows the person doing the work of cleaning up a contaminated site to attempt to pass the bill on to the person, or persons, actually responsible for the pollution, provided certain conditions are met. § 9607(a)(4)(B). The purpose of CERCLA is to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts are borne by those responsible for the contamination. *Burlington N.*, 556 U.S. at 602 (citing *Consol. Edison Co. of N.Y. v. UGI Util., Inc.*, 423 F.3d 90, 94 (2d Cir. 2005)); *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 n. 13 (1994) ("CERCLA is designed to encourage private parties to assume the financial responsibility of cleanup by allowing them to seek recovery from others.").

In its motion for summary judgment, Joslyn argues that Valbruna's cost recovery action, filed on February 11, 2010, is barred by the statute of limitations. The limitations period for an initial action for recovery of costs can be found at 42 U.S.C. § 9613(g)(2). That section provides, in relevant part:

> **(2)**   Actions for recovery of costs
>
>    An initial action for recovery of the costs referred to in section 9607 of this title must be commenced –
>
> **(A)**   for a removal action, within 3 years after completion of the removal action . . .
>
> **(B)**   for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action . . . [.]

Both parties agree that the action Valbruna is currently taking at the Site (the ERH and associated cleanup efforts) is a "remedial action," so subsection 9613(g)(2)(B) governs when the statute of

---

[3] Valbruna is also pursuing a declaratory judgment of Joslyn's continuing liability for contamination at the Site [DE 1 at 7], but for all purposes relevant to this order, that claim is derivative to the cost recovery action.

limitations began to run for this lawsuit. The issue under debate is when the triggering event – the "initiation of physical on-site construction of the remedial action" – occurred. Valbruna argues that it occurred in 2005, when the ERH project commenced. Joslyn believes that it occurred in the 1980s or early 1990s, when Slater first attempted to address pollution at the Joslyn surface impoundment and waste pile areas, and that this lawsuit is therefore time-barred.[4] Valbruna's rejoinder is that those earlier actions were removal actions, not a part of the current remedial action. As a result, Valbruna argues, any recovery for *those* expenses is barred under subsection 9613(g)(2)(A), but that has no effect on recovery for the remedial action currently underway.

The court agrees with Valbruna that Slater's actions were removal actions, and therefore do not determine when the statute of limitations began to run for a cost recovery action based on Valbruna's current remedial work. Moreover, there is an alternate basis for denying summary judgment apparent in the record. Even if Slater's actions were remedial in nature, the undisputed evidence shows that they were discrete, divisible "operable units" such that they have no bearing on Valbruna's ability to recover for the remedial action now underway.

## A.    Slater's Cleanup Efforts in the 1980s and 1990s Were Removal Actions, so the Present Action Is Timely.

The court agrees with Valbruna that the actions Slater took in the 1980s and 1990s were removal actions, for two reasons. First, federal regulations identify those exact actions, when taken under circumstances like those present in this case, as removal actions. Second, although Slater's

---

[4] In passing, the court notes that the earliest date that the cause of action could have accrued is October 17, 1986, which is the effective date of the CERCLA statute of limitations, because the limitations period cannot have begun to run prior to its enactment. *See United States v. Fairchild Indus., Inc.*, 766 F.Supp. 405, 415 (D. Md. 1991); *Velsicol Chemical Corp. v. Enenco, Inc.*, 9 F.3d 524, 528–29 (6th Cir. 1993); *United States v. Moore*, 698 F.Supp. 622, 625–27 (E.D. Va. 1988).

efforts have some characteristics in common with both removal and remedial actions as generally exemplified in the case law, on balance they are more consistent with what courts typically consider to be removal actions. As a result, Valbruna's lawsuit is not time-barred.

       *1.    The statutory scheme and federal regulations suggest that Slater's activity was a removal.*

The terms "removal action" and "remedial action" represent the two primary forms of response contemplated by CERCLA, and they are statutorily defined:

**(23)** The terms "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C.A. § 5121 et seq.].

**(24)** The terms "remedy" or "remedial action" means those actions consistent with [the] permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health and welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more

9

cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C. § 9601(23)-(24).

At first glance, it would appear that the actions Slater took at the surface impoundment and waste pile qualify as a "remedial action;" the definition specifically includes excavations and clay covers, *inter alia*. § 9601(24). But cases suggest that, under a proper reading of the statutory distinction, it is not possible to determine whether an action is a removal action or a remedial action based solely on the characteristics of the action itself. The court must instead look to the circumstances which the action is meant to address. Practically speaking, "removal actions are 'those taken to counter imminent and substantial threats to public health and welfare,' while remedial actions 'are longer term, more permanent responses.'" *Morrison Enters., LLC v. Dravo Corp.*, 638 F.3d 594, 608 (8th Cir. 2011) (quoting *Minnesota v. Kalman W. Abrams Metals, Inc.*, 155 F.3d 1019, 1024 (8th Cir. 1998)); *see also See also Carson Harbor Village, Ltd. v. Unocal Corporation*, 287 F.Supp.2d 1118, 1158 (C.D. Cal. 2003) (property owner's cleanup of tar-like and slag materials was "remedial action" because there was no evidence that the materials posed the type of threat to human health and welfare that required immediate action); *Advanced Micro Devices, Inc. v. National Semiconductor Corp.*, 38 F.Supp.2d 802, 810 (N.D. Cal. 1999) (removal actions are "short-term action[s] taken to halt the immediate risks posed by hazardous wastes"); *Channel Master Satellite Systems, Inc. v. JFD*, 748 F.Supp. 373, 385 (E.D.N.C. 1990) ("The courts have consistently found that the removal category was to be used in that limited set of circumstances involving a need for rapid action, while non-urgent situations are to be addressed as remedial actions").

Moreover, the federal regulations support that approach. They provide a non-exhaustive list of actions which qualify as "removals," but only under certain circumstances:

(1)     Fences, warning signs, or other security or site control precautions – where humans or animals have access to the release;

(2)     Drainage controls, for example, run-off or run-on diversion – where needed to reduce migration of hazardous substances or pollutants or contaminants off-site or to prevent precipitation or run-off from other sources, for example, flooding, from entering the release area from other areas;

(3)     Stabilization of berms, dikes, or impoundments or drainage or closing of lagoons – where needed to maintain the integrity of the structures;

(4)     Capping of contaminated soils or sludges – where needed to reduce migration of hazardous substances or pollutants or contaminants into soil, ground or surface water, or air;

(5)     Using chemicals and other materials to retard the spread of the release or to mitigate its effects – where the use of such chemicals will reduce the spread of the release;

(6)     Excavation, consolidation, or removal of highly contaminated soils from drainage or other areas – where such actions will reduce the spread of, or direct contact with, the contamination;

(7)     Removal of drums, barrels, tanks, or other bulk containers that contain or may contain hazardous substances or pollutants or contaminants – where it will reduce the likelihood of spillage; leakage; exposure to humans, animals, or food chain; or fire or explosion;

(8)     Containment, treatment, disposal, or incineration of hazardous materials – where needed to reduce the likelihood of human, animal, or food chain exposure; or

(9)     Provision of alternative water supply – where necessary immediately to reduce exposure to contaminated household water and continuing until such time as local authorities can satisfy the need for a permanent remedy.

40 C.F.R. § 300.415(e)(1)-(9). One can see immediately that it is, at least partially, the circumstances in which an action is taken that must determine whether that action is a "removal"

11

or a "remedial" action under the statutory and regulatory scheme. Otherwise, the list of removal actions contained in the federal regulations would be hopelessly in conflict with the statutory text. In fact, every item listed in the regulations as a "removal action" is also specifically included in the meaning of "remedial action" by the statutory definition. *See* 42 U.S.C. § 9601(24).

Items (4) and (6) seem directly applicable to what Slater did in this case. Slater's actions consisted of soil and sludge excavations, site capping, and groundwater monitoring and assessment. [DE 42-7 at 36]. The purpose of those efforts was, among other things, to "prevent or mitigate any migration or releases of hazardous waste and/or hazardous constituents at or from the facility." [DE 46-7 at 8]. Such releases, or threatened releases, had drawn the attention of the EPA and IDEM, which were not convinced (despite Slater's efforts) that conditions at the areas in question following initial excavation were "not harmful to human health and the environment [or] that closure by removal had been achieved." [DE 46-7 at 9]. IDEM was also concerned, based on regional groundwater movement patterns, that the pollutants at issue would transfer into a local river, especially given the relatively shallow depth of groundwater in the area. [DE 46-7 at 8-9]. Joslyn seems to suggest that the fact that Slater's efforts to clean up the surface impoundment began with its desire to come into compliance with the newly-passed Resource Conservation and Recovery Act ("RCRA") means it could not have been a removal action, but that seems to be besides the point. Whether Slater was combating an impending environmental threat out of fear of regulatory enforcement or out of a more benevolent desire to keep others safe, either way it was still combating an impending environmental threat.

The court recognizes that it is not an easy question, considering the overlap between the statutory definitions. *See Public Serv. Co. of Colo. v. Gates Rubber Co.*, 175 F.3d 1177, 1182 (10th

Cir. 1999) (noting that elements of remedial actions and removal actions "may overlap and semantics often obscure the actual nature of the cleanup performed"). But where, as here, the actions were taken as a sort of "first response," in order to mitigate a substantial present or threatened release of pollutants into ground and surface water, EPA regulations strongly suggest classifying them as "removal" actions. 40 C.F.R. § 300.415(e)(4); (e)(7).

> 2.    *On balance, Slater's activities are more consistent with what courts typically consider to be removal actions than with what courts typically consider to be remedial actions.*

Although Slater's efforts have some characteristics in common with both removal and remedial actions as generally exemplified in the case law, on balance they are more consistent with what courts typically consider to be removal actions.

Joslyn relies on only a few cases to argue that Slater's actions were part of the "remedial" action to be taken at the Site. The first, and the case on which Joslyn relies most heavily, is *Cytec Indus., Inc. v. B.F. Goodrich Co.*, 232 F.Supp.2d 821 (S.D. Ohio 2002). In *Cytec*, cleanup efforts at a contaminated site commenced after the EPA inspected the facility for RCRA compliance and designated 28 waste management areas for further evaluation. *Id*. at 825-26. The plaintiff began its compliance efforts by designating two ponds – the major problem areas identified by the EPA evaluation – for closure. *Id*. at 826. The court was asked to consider whether the pond cleanups were part of the larger remedial action for the entire site. It found that they were, largely because "[t]he cleanup of Ponds 1 and 2 was not the result of an immediate release or threat of release of hazardous substances[.]" *Id*. at 838. The court also considered that removal actions generally cost less, and take less time, than remedial actions. *Id*. at 833. "Further, '[r]emoval concerns are more procedural in nature in that they speak to 'monitoring,' 'assessing,' and 'evaluating' the measures necessary to

abate short-term, manageable environmental cleanup.'" *Id.* (quoting *Rhodes v. County of Darlington, S.C.*, 833 F.Supp. 1163, 1182 (D.S.C. 1992)).

Joslyn thinks *Cytec* is a near-exact analogue, but the facts of this case produce a mixed match at best. On one hand, Slater's actions in this case spanned several years – roughly a decade, in fact. That does seem incompatible with the typically short time duration ascribed to removal actions by *Cytec* and other authorities. *See Pub. Serv. Co. v. Gates Rubber Co.*, 175 F.3d 1177, 1182 (10th Cir. 1999) ("Generally, a removal action costs less, takes less time, and is geared to address an immediate release or threat of release," whereas a remedial action, which "usually cost[s] more and take[s] longer," "seeks to effect a permanent remedy to the release of hazardous substances when there is no immediate threat to the public health"). But on the other hand, unlike the cleanup in *Cytec*, the Slater cleanup in this case does appear to have been for the purpose of combating the threat of release of hazardous substances, as indicated in the documentary evidence, although RCRA compliance was obviously also on the table. The cleanup at the surface impoundment and waste pile do not appear to have come at great expense, and the Slater cleanup plans spoke to "monitoring," "assessing," and "evaluating" at considerable length, all of which the *Cytec* court considered to be indicative of a removal action, not a remedial action. *See* 232 F.Supp.2d at 833. Moreover, the duration of an action is just one factor to consider. Under the right circumstances, a removal action can last quite some time. *See Vill. of Milford v. K-H Holding Corp.*, 390 F.3d 926, 934 (6th Cir. 2004) (in which the Sixth Circuit held that a short terms of duration are not "requirements for finding the costs of action recoverable as removal costs); *United States v. Nalco Chem. Co.*, 2002 WL 548840 (finding a removal action lasting from 1974 to 1998).

Beyond *Cytec*, Joslyn only cites a few authorities, and does so in passing. Joslyn cites *United*

*States v. Navistar Intl. Trans. Corp.*, 152 F.3d 702, 713 (7th Cir. 1998), for the proposition that the placement of a clay cover over a landfill triggers the subsection 9613(g)(2)(B) limitations period, but the parties in that case did not dispute that the action in question was remedial. They disputed only when the remedial action was initiated. Joslyn also cites *Schaefer v. Town of Victor*, 457 F.3d 188, 203-204 (2d Cir. 2006), and *Yankee Gas Services Co. v. UGI Utilities, Inc.*, 616 F.Supp.2d 228 271-75 (D.Conn. 2009), to suggest that excavation and re-fill activities are inherently remedial in nature. But putting so much emphasis on the type of activity undertaken, and not on the circumstances in which it was undertaken, seems to fly in the face of the regulatory framework, as discussed above. It also conflicts with the Seventh Circuit's previous acknowledgment that excavation and capping *can* be considered a removal action. *See Schalk v. Reilly*, 900 F.2d 1091, 1093 (7th Cir. 1990) (splitting a cleanup effort into "a removal action involving surface excavation and capping of abandoned dump sites" and a subsequent remedial action to eradicate all hazardous wastes); *see also United States v. Cantrell*, 92 F.Supp.2d 704, 715 (S.D. Ohio 2000) (clay capping considered a removal action).

Viewing all of the factors the courts in these cases have considered, it seems clear that Slater's actions were a removal, not a remediation. The only factors weighing in favor of classifying the actions as a remediation is that the process took several years, and that cleaning up those two small sites was consistent with the purpose of the wider remedial action now underway. [DE 49 at 6]. But the duration is not dispositive. *See United States v. Peterson Sand & Gravel, Inc.*, 824 F.Supp. 751, 753 (N.D. Ill. 1991) ("Clearly, the term removal . . . includes time necessary to dispose of the removed material as well as the time needed to evaluate the need for further activity"). And consistency with the objectives of remediation cannot, alone, be enough. If one adopts a wide

15

enough perspective, every removal action is consistent with every remedial action in that all are attempts to alleviate environmental concerns. Joslyn's argument is generic in that way; it claims that the earlier actions were steps towards the permanent remedy simply because they removed contamination. [DE 49 at 6]. But the excavations and capping at the surface impoundment and waste pile were not consistent with current ERH remedial measures in any case-specific, meaningful way. In fact, excavation/removal and the in-place eradication of contaminants through ERH seem like two completely unrelated ways to combat contaminants in the soil and groundwater.

More importantly, the Slater cleanup in the 1980s and 1990s was undertaken to combat an environmental threat, was narrowly tailored to address that specific threat, included monitoring and evaluation components with an eye towards a larger-scale remedial action in the future, and was not exceptionally complex or expensive. Under the relevant cases as cited by both parties, all of those factors weigh in favor of considering Slater's cleanup efforts at the surface impoundment and waste pile a removal action. That interpretation is also consistent with the federal regulations, which specifically designate the actions taken by Slater, in this context, as "removal actions."

       3.    *Valbruna's lawsuit is timely.*

The court has determined that Slater's actions in the 1980s and 1990s were not remedial in nature, but were a prior removal action. The next question is whether the "initiation of physical on-site construction of the remedial action" which is currently ongoing occurred within six years of the filing of this lawsuit. The suit was filed on February 11, 2010. That means the triggering event must have occurred sometime after the same date in 2004, in order for Valbruna's remedial expenses to be recoverable. It is undisputed that the ongoing remedial action was in the planning stages several years before that date. For example, on September 11, 2002, Slater initially provided IDEM

16

with a proposed Remediation Work Plan for the entire Site. [DE 46-13]. But Slater entered bankruptcy not long thereafter, and no work was commenced with respect to the remedial plan until several years later. Specifically, on May 3, 2005, Valbruna's environmental consultant submitted a Remedial Work Plan to IDEM which laid out a plan to use ERH for soil and groundwater remediation of trichloroethylene at the Site. [DE 46-17]. IDEM approved, and the ERH project commenced on May 23, 2005. [DE 46-18 at 7].

In our circuit, the triggering event occurs when "the (1) physical (2) initiation (3) on the site (4) of the construction (5) of the remedial action" takes place. *Navistar*, 152 F.3d at 711. It need not occur after the final remedial work plan is adopted, *Id*. at 711-12,[5] and it in fact occurred earlier in this case. The earliest evidence the court can find in the record of physical on-site construction consistent with the remediation plan is when Valbruna's environmental consultant "mobilized the [Site] for well abandonment and the installation of new monitoring wells" on February 14, 2005. [DE 46-17 at 22]. No party produced any evidence of actions prior to that date which might qualify as the triggering event under the Navistar test (aside from Slater's actions in the 1980s and 1990s, which this court has found do not qualify because they constituted a removal effort). Since that date was within the six years preceding the filing of the suit, Valbruna's action is timely and may proceed.

---

[5] The Ninth Circuit has gone so far as to conclude that "the initiation of physical on-site construction of the remedial action" under the statute "can only occur *after* the final remediation plan is adopted[,]" and that action taken before the plan adoption cannot constitute "remedial action" for statute-of-limitations purposes. *California ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.*, 358 F.3d 661, 667 (9th Cir. 2004) (emphasis added). That would mean the triggering event in this case could not occur until on or after May of 2005, but our circuit has previously declined to draw such a bright line. *Navistar*, 152 F.3d at 711-12.

**B.      Even if Slater's Actions Were Remedial in Nature, They Were Discrete, Divisible "Operable Units."**

Even if the actions Slater took in the 1980s and 1990s were remedial in nature, there is an alternative basis for denying summary judgment on statute of limitations grounds. Slater's actions at the surface impoundment and waste pile were a separate and distinct cleanup effort from the ERH remediation, and as such had no effect on when the statute of limitations began to run for the remedial action currently taking place.

It is true that some courts have found that different phases of the same removal or remedial action cannot serve as the basis for separate legal actions. *See Colorado v. Sunoco*, 337 F.3d 1233, 1241 (10th Cir. 2003); *Kelley v. E.I. DuPont de Nemours and Co.*, 17 F.3d 836, 841-44 (6th Cir. 1994). In *Sunoco*, the Tenth Circuit observed:

> Although both subsections (A) and (B) of § 9613(g)(2) use the indefinite article "a" to modify the phrases "removal action" and "remedial action," they both use the definite article "the" to modify those same phrases. As asserted by defendants, use of this definite article suggests there will be but a single "removal action" and a single "remedial action" per site. Perhaps most persuasive is the language in subsection (B) which states that "if *the remedial action* is initiated within 3 years after the completion of *the removal action*, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph." In our view, this language indicates there will be but one "removal action" per site or facility, as well as a single "remedial action" per site or facility. If Congress intended to allow multiple actions for separate components of recovery or remedy, it surely would have used the indefinite article "a" rather than the definite article "the" to modify the phrases "removal action" and "remedial action."

337 F.3d at 341-42 (internal citations omitted). The Tenth Circuit's conclusion – that Congress would have used the indefinite article "a" to modify the phrases "removal action" and "remedial action" if it intended to allow multiple actions for separate cleanup components – is interesting, considering that Congress *did* use the indefinite article "a", a fact which the Tenth Circuit

18

acknowledges earlier in the same paragraph. To acknowledge that Congress used both "a" and "the," only to then assign dispositive importance to one of the two without much more, seems less than convincing. The Sixth Circuit's approach in *Kelley* was similar. *See* 17 F.3d at 843 (concluding that Congress's choice of the modifying articles "a" and "the" to precede "removal action," *see* 42 U.S.C. § 9613(g)(2)(A), if it proves anything, proves that Congress intended that there generally will be only one removal action."). This court is reluctant to decide such a significant issue relying solely on the use of definite and indefinite articles.

A more thorough examination comes from *United States v. Manzo*, 182 F.Supp.2d 385 (D.N.J. 2000). In *Manzo*, Judge Cooper agreed that the statute was ambiguous. But rather than infer congressional intent from the use of one form of article where two forms of article were used, Judge Cooper discussed at length the legislative history of the statute and the administrative framework established by the EPA. *Id*. at 401-02. Among other things, she noted that the House Conference Report accompanying the SARA[6] amendment to CERCLA in 1986 explicitly acknowledged the availability of multiple actions based on separate "phases" of a cleanup:

> Similarly, if a response action is being conducted at a complex site with many areas of contamination, a challenge could lie to a completed excavation or incineration response in one area, as defined in a Record of Decision, while a pumping and treating response activity was being implemented at another area of the facility. It should be the practice of the President to set forth each separate and distinct phase of a response action in a separate Record of Decision document. *Any challenge under this provision to a completed stage of a response action shall not interfere with those stages of the response action which have not been completed.*

H.R. Conf. Rep. No. 99-962 at 224 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3276, 3317 (emphasis added). This expression of congressional intent could not be more clear. Not only did Congress

---

[6] Referring to the "Superfund Amendments and Reauthorization Act," which created the statute of limitations under discussion.

intend to make different actions available for different phases of a response, it urged the President to set forth EPA regulations consistent with that intent.

Judge Cooper accordingly concluded that separate actions for multiple removal or remedial actions *can* be available under the right circumstances. But, obviously, breaking down a response action too far is unacceptable. *See, e.g., Kelley*, 17 F.3d at 843 (noting that, clearly, each barrel removed from a cleanup site does not trigger a new limitations period). Judge Cooper reasoned that the logical "breakdown point" is one essentially consistent with the EPA concept of the "operable unit." 182 F.Supp.2d at 402. An "operable unit," as defined by EPA regulations:

> [M]eans a discrete action that comprises an incremental step toward comprehensively addressing site problems. This discrete portion of a remedial response manages migration, or eliminates or mitigates a release, threat of a release, or pathway of exposure. The cleanup of a site can be divided into a number of operable units, depending on the complexity of the problems associated with the site. Operable units may address geographical portions of a site, specific site problems, or initial phases of an action, or may consist of any set of actions performed over time or any actions that are concurrent but located in different parts of a site.

40 C.F.R. § 300.5. The regulation is reflective of the reality that CERCLA cleanups often, like the one in this case, span several decades. They tend to evolve continuously, in phases, from the initial detection of contamination to a final solution for the entire threatened site. Moreover, EPA regulations are entitled to deference, especially where the statutory text is ambiguous. 182 F.Supp.2d at 402 (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984); *Christensen v. Harris County*, 529 U.S. 576 (2000). The regulations, in addition to the legislative history, suggest the availability of multiple actions.

Many courts have recognized that CERCLA response actions are conducted in divisible parts, and, like Judge Cooper in *Manza*, have tethered the statute of limitations in one way or another to the "operable units," or distinct phases, of a cleanup project. *See, e.g., United States v. Ambroid*

20

*Co., Inc.*, 34 F.Supp.2d 86 (D.Mass. 1999) (considering each of several remedial actions separately for purposes of determining the statute of limitations); *Douglas Autotech Corp. v. The Scott Fetzer Co.*, 2008 WL 205217 (W.D. Mich. 2008) (analyzing two cleanup phases separately for statute of limitations purposes).[7]

The evidence in this case shows that even if Slater's actions at the surface impoundment and waste pile were remedial actions, they were distinct from the remedial project undertaken by Valbruna over the last decade. First, they were the product of a different set of consent orders with IDEM and the EPA, issued in the 1980s. [DE 46-7]. Second, they dealt primarily with RCRA compliance in two small areas that comprised only a fraction of the whole Site, not with overall CERCLA compliance at the whole Site, as the current remedial plan does. Third, they were completed in the early 1990s and certified completed by IDEM in 1999. [DE 42-7 (certificate of completion of work required at surface impoundment and waste pile)]. That was before the current Site-wide remedial action was even found to be necessary [DE 46-7 (Notice ov Violation issued in 2000)], developed [DE 46-13 (proposed remediation work plan submitted to IDEM in September of 2002)], approved, or put into action. [DE 46-18 (both occurring in 2005)]. Finally, and most importantly, Slater's cleanup effort at the surface impoundment and waste pile perfectly match the regulatory definition of a distinct "operable unit," in that it was a "discrete action that comprise[d] an incremental step toward comprehensively addressing site problems" which "manage[d]

---

[7] The court notes that the Seventh Circuit has also recently employed the "divisibility" approach to a CERCLA statute of limitations question. *See Bernstein v. Bankert*, 702 F.3d 964, 981-84 (7th Cir. 2012) (analyzing a pair of removal actions separately for statute of limitations purposes where each removal action was the product of a separate consent order and where the first removal action was certified complete by the EPA before the nature of the second removal action was even determined); *but see Navistar*, 152 F.3d 702, 713 (noting that the mere fact that a first attempt at removal fails and has to be repeated does not mean that a second attempt of the same removal action founds a new cause of action). Since the time available for possible rehearing on the *Bernstein* decision has not yet expired, this court will not rely on *Bernstein* as dispositive. But there is no need to do so. The remaining authorities on the issue are persuasive.

migration, or eliminate[d] or mitigate[d] a release, threat of a release, or pathway of exposure" and "address[ed] geographical portions of a site[.]" 40 C.F.R. § 300.5.

Slater's actions in the 1980s and 1990s at the surface impoundment and waste pile were removal actions, and for that reason had no impact on when the statute of limitations for the current remedial action began to run. But even if they were remedial actions, they were separate and distinct remedial actions – "operable units" which were divisible from the current project – which likewise had no bearing on when the statute of limitations for the current project began to run.

## II.     VALBRUNA'S MOTION TO STRIKE [DE 47]

On March 14, 2012, Valbruna moved to strike eight of the exhibits Joslyn submitted in support of summary judgment. [DE 47]. Joslyn's objection is that the exhibits – each retrieved from the IDEM website – were not properly authenticated. Since the court has concluded that Joslyn's motion for summary judgment must be denied as a matter of law even when the exhibits in question *are* considered, it is not prejudicial to Valbruna to allow them into the summary judgment record. Valbruna's motion to strike is accordingly denied.

### CONCLUSION

For the reasons stated herein, Joslyn's motion for summary judgment [DE 42] is **DENIED**. The federal regulations differentiating between removal and remedial actions weigh in favor of classifying Slater's activities at the Site in the 1980s and 1990s as removal, rather than remedial, activities, and the balance of the factors referenced by the case law support the same conclusion. Even if that were not the case, Slater's actions in the 1980s and 1990s were distinct from the remedial action underway, and therefore have no impact on when the statute of limitations began to run. Finally, Valbruna's motion to strike [DE 47] is **DENIED**.

SO ORDERED.

ENTERED:   March 21, 2013

                                    /s/ JON E. DEGUILIO
                                Judge
                                United States District Court