UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| VALBRUNA SLATER STEEL CORPORATION and FORT WAYNE STEEL CORPORATION, | ) ) ) ) |
| Plaintiffs, | ) Case No. 1:10-CV-044-JD ) |
| v. | ) ) |
| JOSLYN MANUFACTURING COMPANY, JOSLYN CORPORATION and JOSLYN MANUFACTURING COMPANY, LLC, | ) ) ) ) ) |
| Defendants. | ) |

## OPINION AND ORDER

### I. Facts and Procedural History

This is a Superfund case about who should bear the cost of cleaning up contamination at a steel processing site. The factual background of this litigation is lengthy and much of it has been set forth in prior orders. So, this order will contain only a brief summary of relevant facts.

Plaintiffs Valbruna Slater Steel Corporation and Fort Wayne Steel Corporation (collectively Valbruna) own property located at 2302 and 2400 Taylor Street in Fort Wayne, Indiana (the Site). Valbruna claims that one of the Site's previous owners, Joslyn Manufacturing Company, contaminated it with chlorinated solvents, metals and other contaminants. So, Valbruna filed suit under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §9607(a), and Indiana's Environmental Legal Action (ELA) statute, Ind. Code §§ 13-30-9-1 *et seq.*, to recover the money it has spent cleaning up the Site. Joslyn responded with a CERCLA counterclaim.

More than five years have passed since this lawsuit began. The Court has since resolved

two motions for summary judgment filed by Joslyn. One of these, which the Court denied, argued that Valbruna's suit should be barred by CERCLA's statute of limitations. [DE 50]. The other argued that Valbruna's claims should be barred by claim preclusion due to prior state court litigation between Joslyn and Slater Steels Corporation (which sold the Site to Valbruna Slater Stainless Inc., Valbruna's corporate parent, in a bankruptcy auction). The Court granted that motion as to Valbruna's state-law ELA claim but denied it as to Valbruna's CERCLA claim. [DE 39]. Now only Valbruna's CERCLA claim (and accompanying request for a declaratory judgment) and Joslyn's CERCLA counterclaim remain. Discovery has closed and the parties have filed and fully briefed a new round of motions for summary judgment.

## II. Josyln's Motions for Summary Judgment on Claim Preclusion and the Statute of Limitations

Joslyn filed two motions for summary judgment, which argue that Valbruna's suit is barred by claim preclusion and CERCLA's statute of limitations. [DE 96; DE 99]. These issues have already been thoroughly litigated in this case. As noted above, Joslyn first raised them in prior motions for summary judgment. [DE 19[1]; DE 42]. The Court held that the statute of limitations did not bar Valbruna's claim, and that the parties' prior state court litigation barred Valbruna's state law claim, but not its federal CERCLA claim. [DE 35; DE 50]. Joslyn then filed a motion to reconsider the claim preclusion issue. [DE 36]. The Court amended its reasoning in response to that motion, but once more denied summary judgment. [DE 39]. Joslyn subsequently sought leave from the magistrate judge to file an amended answer, which reiterated Joslyn's claim preclusion and statute of limitations defenses. [DE 52]. The magistrate judge

---

[1] Joslyn's claim preclusion argument was initially presented as a motion to dismiss, but the Court converted it to a motion for summary judgment.

permitted Joslyn to file an amended answer, but struck the claim preclusion and statute of limitations defenses, finding:

> [T]he Court squarely addressed and explicitly rejected the claim preclusion and statute of limitations defenses in separate, lengthy opinions denying Joslyn's motions for summary judgment. As such, striking them from the Amended Answer eliminates unnecessary clutter . . . More to the point, Joslyn gambled with its summary judgment motions that it could get out of the case early, perhaps a sound strategic move, but also one with consequences. Having elected to consume substantial judicial and litigant resources early on, Joslyn does not get another chance—presumably after even more extensive and expensive discovery—to assert defenses the Court has already rejected as a matter of law.

[DE 58 at 5] (citation omitted). Shortly thereafter, Joslyn filed a motion to reconsider that decision [DE 60], contending that the magistrate judge overreached when he "went past the issue that needed to be decided—whether Joslyn's two failed affirmative defenses should be stricken—and appeared to bar Joslyn from filing a successive motion for summary judgment on these defenses." [DE 64 at 4]. The magistrate judge denied that motion, explaining that while the Court's ruling struck Joslyn's affirmative defenses, it did not absolutely bar successive summary judgment motions. The magistrate judge informed Joslyn that, should it believe at a later point in litigation that "'good reasons' exist, then it *may seek leave of court* to file a successive motion for summary judgment." *Id.* (emphasis added). Joslyn then filed the motions for summary judgment currently before the Court, which attempt to rehash the claim preclusion and statute of limitations issues. It did not seek leave to do so.

It is within this Court's discretion to permit a party to file a renewed motion for summary judgment. *Whitford v. Boglino*, 63 F.3d 527, 530 (7th Cir. 1995); *Gordon v. Veneman*, 61 F. A'ppx 296, 298 (7th Cir. 2003). A successive summary judgment motion is particularly appropriate "1) when the controlling law has changed; 2) when new evidence has been discovered; and 3) when allowing such a motion would be necessary to correct a clear error or prevent a manifest injustice." *Gordon*, 61 F. App'x at 298 (citing *Whitford*, 63 F.3d at 530).

The Court is unwilling to permit successive motions for summary judgment here. It has

3

already addressed the issues raised by Joslyn at length. Moreover, the magistrate judge struck the claim preclusion and statute of limitations defenses from Joslyn's answer with a directive that, "should Joslyn believe that . . . 'good reasons' exist, then it may seek leave of court to file a successive motion for summary judgment." [DE 64 at 4]. Joslyn flagrantly ignored that ruling, filing its motions without first seeking leave to do so. To the extent Joslyn may be arguing that it obtained leave of court when during a telephonic status conference the undersigned acknowledged its stated intent to refile said motions, without any disclosure of prior rulings by the magistrate judge and without explicitly granting leave of court, that argument is unavailing and somewhat disingenuous. Accordingly, the Court denies Joslyn's motions for summary judgment.[2]

### III. Valbruna's Motion for Summary Judgment as to Joslyn's § 107(a) Liability

Valbruna also filed a motion for summary judgment. It seeks findings that: (1) Joslyn is liable to Valbruna under § 107(a)[3] of CERCLA, (2) Valbruna is entitled to recover its past costs from Joslyn and (3) Valbruna is entitled to recover its future costs that are consistent with CERCLA from Joslyn.

A. *Standard of Review*

Summary judgment is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[2] The Court also strikes Joslyn's abbreviated request to certify this order for immediate appeal under 28 U.S.C. § 1292(b). Joslyn may refile its request to the extent it wishes to do so in light of this order, and to afford the Court more information as to why counsel believe a § 1292(b) appeal is warranted in this case.

[3] While this provision is codified as 42 U.S.C. § 9607(a), the Court will refer to it as § 107(a). It will use the same convention for other CERCLA provisions.

"Once a party has made a properly-supported motion for summary judgment, the nonmoving party may not simply rest upon the pleadings but must instead submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (internal quotation marks omitted). Since the Court is evaluating a motion for partial summary judgment filed by Valbruna, it will construe all disputed facts in the light most favorable to the Joslyn. *See Anderson*, 477 U.S. at 255 (at the summary judgment stage "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor").

      *B. Valbruna's § 107(a) Claim*

CERCLA, also known as Superfund, is a very complicated piece of environmental legislation. Among other things, it provides a cause of action to private parties that incur environmental cleanup costs. Section 107(a) of CERCLA "permits cost recovery (as distinct from contribution) by a private party that has itself incurred cleanup costs." *United States v. Atl. Research Corp.*, 551 U.S. 128, 139 (2007). Section 113(f) provides a contribution action to potentially responsible persons (PRPs) "with common liability stemming from an action instituted under § 106 [which allows the Government to bring suit against PRPs to force them to clean up hazardous waste] or § 107(a)[.]" *Id.* Fortunately, this case does not implicate the abstruse distinctions between those statutory subsections. Valbruna is proceeding under § 107(a), and Joslyn does not contest the procedural propriety of that decision.

Under § 107(a), CERCLA liability attaches where "(1) the site in question is a 'facility' as defined by CERCLA; (2) the defendant is a responsible party; (3) there has been a release or there is a threatened release of hazardous substances; and (4) the plaintiff has incurred costs in response to the release or threatened release." *Sycamore Indus. Park Assocs. v. Ericsson, Inc.*,

546 F.3d 847, 850 (7th Cir. 2008) (citing 42 U.S.C. § 9607(a); *Envtl. Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 506 (7th Cir. 1992); *3550 Stevens Creek Assocs. v. Barclays Bank*, 915 F.2d 1355, 1358 (9th Cir.1990)). To establish a prima facie case under CERCLA, a non-governmental plaintiff must also meet a fifth requirement: it "must show that any costs incurred in responding to the release were 'necessary' and 'consistent with the national contingency plan.'" *Forest Park Nat. Bank & Trust v. Ditchfield*, 881 F. Supp. 2d 949, 977 (N.D. Ill. 2012) (citing 42 U.S.C. § 9607(a)(4)(B); *G.J. Leasing Co. v. Union Elec. Co.,* 54 F.3d 379, 386 (7th Cir. 1995)); *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 791 (7th Cir. 2000). Joslyn does not contest the first four elements of the above analysis. Rather, it argues that Valbruna cannot satisfy the fifth element because Valbruna has not incurred costs that are necessary or consistent with the National Contingency Plan (NCP). Joslyn also argues that its § 113(f) counterclaim turns this into a suit for contribution, which is governed by equitable principles, as opposed to § 107(a)'s joint and several liability scheme.

### C. Effect of Joslyn's § 113(f) Counterclaim

The elements required to establish a prima facie case under § 113(f) are the same as those under § 107(a). *Bedford Affiliates v. Sills*, 156 F.3d 416, 427 (2d Cir. 1998). But, under § 113(f), the district court has "broad and loose" authority to equitably allocate remediation costs between PRPs. *NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 695 (7th Cir. 2014). In contrast, liability under § 107(a) is joint and several unless there is a reasonable basis for determining the contribution of each cause to a single harm. *Bernstein v. Bankert*, 733 F.3d 190, 201 (7th Cir. 2013). Joslyn contends that its § 113(f) counterclaim turns this into a suit for contribution, and so the Court should consider equitable factors in determining Joslyn's liability. That puts the cart before the horse. Joslyn's counterclaim depends on its liability to Valbruna

6

under § 107(a). If Joslyn were not liable to Valbruna, it would have neither the need nor a basis to seek contribution. So, the Court must determine Joslyn's liability to Valbruna (and Valbruna's liability to Joslyn, which is not at issue in this order) before diving into equitable considerations under § 113(f). *See Kalamazoo River Study Grp. v. Menasha Corp.*, 228 F.3d 648, 656 (6th Cir. 2000) ("The district court's imposition of a requirement that plaintiffs in contribution actions show causation in order to establish a defendant's liability was erroneous . . . It is true that the equitable contribution principles of § 113(f) permit a district court to consider causation. However, consideration of causation is proper only in allocating response costs, not in determining liability."); *ITT Industries, Inc. v. Borgwarner, Inc.*, 700 F. Supp. 2d 848 (W.D. Mich. 2010) (establishing the Defendants' joint and several liability to the Plaintiff under § 107(a) and the Plaintiff's liability to the Defendants under § 113(f) before equitably allocating costs).

### D. *Necessary Costs*

Joslyn next contends that Valbruna did not incur any necessary costs of response. Under CERCLA, costs are "necessary" if they are incurred in response to a threat to human health or the environment and they are necessary to address that threat. *G.J. Leasing Co. v. Union Elec. Co.*, 854 F. Supp. 539, 562 (S.D. Ill. 1994) *aff'd*, 54 F.3d 379 (7th Cir. 1995). Whether costs are necessary is a mixed question of law and fact. *G.J. Leasing Co. v. Union Elec. Co.,* 54 F.3d 379, 386 (7th Cir.1995). Summary judgment is appropriate for the purposes of determining Joslyn's liability if the undisputed facts demonstrate that at least some of Valbruna's costs were necessary. *See NutraSweet*, 227 F.3d at 782.

According to Joslyn, none of Valbruna's costs were necessary since they were incurred for a "purpose other than responding to an actual and real public health threat." [DE 113 at 18].

7

That argument is unavailing. There is ample uncontested evidence that Valbruna spent at least some amount of money to eliminate contamination that posed a threat to public health. *See, e.g.,* [DE 113 at 18] (agreeing that Valbruna invested $1 million into environmental cleanup at the Site); [DE 114 at 34] (not disputing that Valbruna incurred "costs in connection with asbestos, lead paint, transformer oil, etc., in connection with demolition of the old melt shop," but arguing that it did so to facilitate new construction rather than to address an environmental threat); [DE 101-20 at 16] (discussing Valbruna's remediation efforts, which have cost in excess of $1 million and resulted in the removal of approximately 40,000 pounds of TCE from the subsurface).

Joslyn sidesteps the public health threat issue and instead focuses on Valbruna's intentions. It contends Valbruna cleaned up the Site to take advantage of a business opportunity, rather than to remediate the environment. Such costs, Joslyn says, are not compensable under the district court opinion in *G.J. Leasing*, which found that the plaintiffs did not incur necessary costs where they cleaned up a site for business reasons. 854 F. Supp. at 562.

But that ignores a sizeable distinction between *G.J. Leasing* and this case. In *G.J. Leasing*, the court did not find any evidence of a public health threat. *Id.* ("Plaintiffs have not demonstrated that there are any actual or potential risks posed by conditions at the Site."). While it noted the plaintiffs' business motivations, those simply underscored the absence of a public health threat. *G.J. Leasing* would not appear to foreclose recovery for plaintiffs like Valbruna who respond to a clear public health threat, even if they do so for purportedly commercial reasons. Moreover, even if the Court did subscribe to Joslyn's interpretation of *G.J. Leasing*, it still would not find subjective motivation to be a relevant consideration in the necessary cost calculus. *See Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 872 (9th Cir. 2001) ("In determining whether response costs are 'necessary,' we focus not on whether a party has a business or other motive in cleaning up the property, but on whether there is a threat

to human health or the environment and whether the response action is addressed to that threat."). Thus, regardless of why it may have done so, Valbruna spent at least some money in response to a public health threat and consequently incurred some necessary costs. That is not to say that all of Valbruna's costs were necessary. Rather, as the Seventh Circuit has indicated, Valbruna will be required to establish that any costs it seeks to recover were related to remediating a public health threat and reasonable in light of the degree of that threat. *G.J. Leasing*, 54 F.3d at 386.

E. *The NCP's Public Participation Requirement*

Joslyn also contends that Valbruna's expenses are not compensable, since they are not consistent with the NCP. Like the evaluation of necessary costs, consistency with the NCP is a mixed question of law and fact. *See, e.g., Bedford*, 156 F.3d at 427. A private party response action is consistent with the NCP if it is in substantial compliance with the NCP and results in a CERCLA-quality cleanup. 40 C.F.R. § 300.700(c)(3)(i). One of the NCP's provisions, 40 C.F.R. § 300.700(c)(6), provides that "[p]rivate parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action[.]" It further lists several provisions regarding public participation that are "potentially applicable to private party response actions." *Id*.

According to Joslyn, Valbruna's expenses were not consistent with the NCP because Valbruna did not fulfill this public participation requirement. Valbruna responds that government agency involvement in a cleanup operation can be sufficient to meet this requirement, and the Plaintiffs executed remediation efforts under the close supervision and oversight of the Indiana Department of Environmental Management (IDEM). Joslyn disagrees, arguing that the public participation requirement serves two purposes: "(1) to ensure that PRPs and concerned citizens that may be affected by cleanup decisions are able to represent their interests; and (2) to ensure that cleanups are carried out in an environmentally sound matter."

9

[DE 113 at 20]. Agency involvement may sometimes satisfy the second requirement, it says, but not the first.

The Seventh Circuit addressed this issue in *NutraSweet*, though only indirectly. 227 F.3d at 791. In that case, the court of appeals found that the involvement of a public agency sufficed to meet the public participation requirement:

> The Illinois EPA approved NutraSweet's clean-up plan, and the agency monitored the progress of the remediation. NutraSweet remediated its property until the Illinois EPA advised it that it could stop because NutraSweet's efforts had succeeded to the maximum extent possible. In light of this evidence, we are satisfied that NutraSweet met this requirement for a CERCLA recovery.

*Id*; *accord Bedford*, 156 F.3d at 428. So, while the Seventh Circuit has not yet decided the issue explicitly, *NutraSweet* "suggests strongly that government agency involvement . . . can provide an adequate substitute for public notice and comment." *Norfolk S. Ry. Co. v. Gee Co.*, 158 F. Supp. 2d 878, 883 (N.D. Ill. 2001); *see also City of Gary, Indiana v. Shafer*, No. 2:07-CV-56-PRC, 2009 WL 1605136, at *14 (N.D. Ind. June 2, 2009).

This Court will follow that precedent. The Seventh Circuit's analysis on this issue, brief as it may be, is the best guidance as to how to proceed. Further, such an approach is reasonable, given the NCP provides that the public comment provisions are not intended to be rigid. *See Bedford*, 156 F.3d at 428. So, it appears that state agency involvement can fulfill the public participation requirement of the NCP.

The agency's involvement must, however, be sufficiently substantial to ensure that the cleanup is carried out in an environmentally sound manner. *Id*. Involvement is substantial where, for example, "a state agency responsible for overseeing remediation of hazardous wastes gives comprehensive input, and the private parties involved act pursuant to those instructions[.]" *Id.*; *see also NutraSweet*, 227 F.3d at 791 (finding NCP compliance where "The Illinois EPA approved NutraSweet's clean-up plan . . . the agency monitored the progress of the remediation

[and] NutraSweet remediated its property until the Illinois EPA advised it that it could stop because NutraSweet's efforts had succeeded to the maximum extent possible."); *Norfolk*, 158 F. Supp. 2d at 882 (finding NCP compliance where "the IEPA was involved in both the approval of [the] remediation plans and the execution of the remediation itself, and then supplied its final stamp of approval by way of two separate No Further Remediation (NFR) Letters.").

Valbruna provides significant evidence that IDEM's involvement was sufficiently substantial to fulfill the public participation requirement. That evidence shows that Valbruna purchased the Site under an agreement with IDEM in which Valbruna agreed to pay $500,000 of a $1,000,000 escrow to remediate the Site in exchange for certain environmental liability protections from IDEM. [DE 104-47 at 15-32]. Valbruna's contractor then prepared a remediation work plan for IDEM which recommended remediating the Site with electrical resistance heating (ERH). IDEM reviewed that remediation work plan and allowed Valbruna to proceed with ERH. [DE 114-16 at 35-36]; [DE 104-48 at 3]. During the ERH process, IDEM reviewed and approved the invoices for the vendor that performed the remediation work. [DE 114-16 at 38]. After the completion of the ERH, IDEM sent Valbruna a risk assessment letter outlining numerous sources of contamination that remained at the Site. [DE 104-47 at 41-47]. Valbruna then enrolled the Site in IDEM's voluntary remediation program to address remaining contamination. [DE 104-44 at 5-6]. Moreover, both Valbruna's environmental manager and the former IDEM project manager for the Site have indicated that IDEM has provided supervision during remediation efforts. [DE 104-44 at 3]; [DE 104-48 at 3].

Joslyn does not provide evidence to refute these contentions. Nor does it provide other evidence that could permit a reasonable finder of fact to conclude that IDEM's involvement in the Site's remediation was insubstantial. Joslyn first points to expenses submitted by Valbruna

and notes that IDEM did not bill Valbruna for any oversight fees in 2005 or 2006 when the ERH took place. [DE 104-44 at 8, 10-11]. But, it is difficult to draw any inference from this, since Joslyn does not offer any indication that substantial oversight typically comes at a cost. Second, Joslyn says that the remediation work plan Valbruna's ERH contractor submitted to IDEM did not comply with the NCP because, among other things, it did not adequately compare potential alternatives to ERH. That does not, however, allow for the inference that IDEM was insubstantially involved in the remediation process. Indeed, it appears that IDEM recognized that the ERH remediation work plan did not meet IDEM's voluntary remediation plan guidelines, but nevertheless allowed ERH to proceed largely because of a guarantee offered by the remediation contractor. [DE 114-16 at 35-36]. Whether that was a well-founded decision or not is irrelevant. The inquiry is whether IDEM was substantially involved in the remediation effort, not whether its choices were prudent. Third, Joslyn says that IDEM has not issued Valbruna a certificate of completion or a covenant not to sue. But, that would seem to be expected since remediation is still ongoing at the Site. And at any rate, it does not indicate a lack of involvement by IDEM. Accordingly, the Court concludes that there is no genuine issue of material fact as to whether IDEM's involvement was sufficiently substantial to satisfy the NCP's public participation requirement. So, Valbruna has established that it incurred expenses consistent with the NCP.[4]

---

[4] Joslyn also briefly argues that Valbruna's costs are not in substantial compliance with the NCP because Valbruna did not conduct a remedial preliminary assessment and site inspection, a remedial investigation/feasibility study or a remedial design/remedial action evaluation. [DE 113 at 20]. It is not necessary to determine the extent to which Valbruna satisfied those elements of the NCP. That is because demonstrating IDEM's substantial involvement in this cleanup is sufficient to establish not merely substantial compliance with the public participation requirement, but substantial compliance with the NCP as a whole. *NutraSweet*, 227 F.3d at 791 (finding NCP compliance where the Illinois EPA approved the cleanup plan, monitored remediation progress and subsequently advised that remediation could cease since it succeeded to the maximum extent possible); *City of Gary*, 2009 WL 1605136, at *14; *Sherwin-Williams Co. v. ARTRA Grp., Inc.*, 125 F. Supp. 2d 739, 753 (D. Md. 2001); *Norfolk*, 158 F. Supp. 2d at 882.

*F. Preliminary Investigation and Monitoring Costs*

That leaves the parties' dispute as to preliminary investigation and monitoring costs. Valbruna says that its preliminary investigation and monitoring costs need not comply with the NCP. Joslyn argues to the contrary, asserting that investigation and monitoring costs, like all other expenses, must comply with the NCP. But the Seventh Circuit has found that site-assessment costs do not have to comply with NCP requirements. *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 617 (7th Cir. 1998) (noting that site-assessment costs "are not subject to the requirement of submission for public comment"); *see also CNH Am., LLC v. Champion Envtl. Servs., Inc.*, 863 F. Supp. 2d 793, 809 (E.D. Wis. 2012) (collecting Seventh Circuit district court cases which hold that "initial investigation, site-assessment, and monitoring costs are recoverable under § 107(a) of CERCLA irrespective of compliance with NCP requirements."). Due to the above conclusion that Valbruna incurred necessary and NCP-compliant expenses, however, the Court need not at this time reach the issue of what (if any) preliminary investigation and monitoring costs Valbrua incurred.

*G. Damages and Declaratory Judgment*

Since Valbruna has shown that it incurred some necessary costs consistent with the NCP—the only part of its prima facie case in dispute—it has succeeded in establishing Joslyn's liability under § 107(a). That means that Joslyn is jointly and severally liable for Valbruna's response costs. *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 614 (2009); *United States v. Capital Tax Corp.*, 545 F.3d 525, 534 (7th Cir. 2008) (noting that joint and several liability is the default rule under § 107(a)).[5] Given the complexity of this case and

---

[5] Joslyn impliedly argues that joint and several liability is restricted to governmental plaintiffs in § 107(a) cases. It provides no support for that argument and the law does not support it. *Padgett Bros. LLC v. A.L. Ross & Sons, Inc.*, No. 1:10-CV-00858-RLY-DM, 2014 WL 3547353, at *8 (S.D. Ind. July 17, 2014) ("Once an entity is determined to be a PRP, it is typically jointly and severally liable for all costs of removal or remediation by a governmental entity

Joslyn's pending counterclaim, however, the Court will defer deciding what those costs are.[6] *See Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 667 (5th Cir. 1989) ("Because of the complexity of CERCLA cases, which often involve multiple defendants and difficult remedial questions, courts have bifurcated the liability and remedial, or damages, phases of CERCLA litigation.").

Finally, the Court notes that Valbruna is seeking a declaratory judgment as to Joslyn's liability for future costs under § 113(g)(2). Since Valbruna prevailed as to its § 107(a) claim, it is entitled to a declaratory judgment as to its future costs. 42 U.S.C. § 9613(g)(2) ("In any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."). Accordingly, Valbruna will be entitled to recover its future costs from Joslyn, but only to the extent that those costs are not offset by Valbruna's liability (if any) to Joslyn under Joslyn's § 113(f) counterclaim. Since the Court finds that a declaratory judgment under CERCLA is appropriate, it need not reach Valbruna's request for a declaratory judgment under 28 U.S.C. § 2201 or Rule 57.

### IV. Conclusion

The Court DENIES Joslyn's motions for summary judgment. [DE 96; DE 99]. It GRANTS Valbruna's motion for summary judgment. [DE 102]. The Court further GRANTS the request for a declaratory judgment in that motion to the extent that such judgment is not offset by Joslyn's pending counterclaim. Since the Court resolves this matter without oral argument, Joslyn's motion for the same is DENIED as moot [DE 115].

---

*and for response costs incurred by any other person.*") (emphasis added); *United States v. SCA Servs. of Indiana, Inc.*, 849 F. Supp. 1264, 1281 (N.D. Ind. 1994) ("The weight of authority establishes that liability under CERCLA is joint and several. Such liability extends to actions for cost recovery brought by private parties[.]")

[6] As a result, the Court will also defer addressing Joslyn's argument that Valbruna has failed to sufficiently itemize its costs.

SO ORDERED.

ENTERED: December 4, 2015

/s/ JON E. DEGUILIO
Judge
United States District Court