UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| VALBRUNA SLATER STEEL CORPORATION and FORT WAYNE STEEL CORPORATION, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Case No. 1:10-cv-44-JD<br>) |
| JOSLYN MANUFACTURING COMPANY; JOSLYN CORPORATION and JOSLYN MANUFACTURING COMPANY, LLC, | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

## OPINION AND ORDER

This case arises under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. §9601 *et seq*. Plaintiffs Valbruna Slater Steel Corporation and Fort Wayne Steel Corporation (collectively Valbruna) filed a cost recovery claim under § 107(a). Defendants Joslyn Manufacturing Company, Joslyn Corporation and Joslyn Manufacturing Company, LLC (collectively Joslyn) filed a contribution counterclaim under § 113(f). The parties tried Phase I of this bifurcated bench trial, on damages, from February 6, 2017 to February 7, 2017. Having considered the evidence, the Court now enters its findings of fact and conclusions of law as to that phase of trial.

## BACKGROUND

This environmental litigation has endured for more than seven years. To summarize briefly, the Plaintiffs own a contaminated steel processing site, which they claim to have spent more than two million dollars to remediate. Their only cause of action (cost recovery under § 107(a)) seeks to require the Defendants, who used to own the site, to reimburse them for their

1

cleanup costs.[1] The Defendants oppose that claim. They also filed a contribution counterclaim (under § 113(f)) arguing that, to the extent they are liable for any expenses, those expenses ought to be equitably reallocated to the Plaintiffs.

While the full factual and procedural background of this matter is extensive (and set forth in prior orders), this case now boils down to two issues. First is the appropriate measure of damages. On summary judgment, the Court found Joslyn jointly and severally liable for the cost of remediating the site but deferred calculating damages. [DE 124]. It accordingly remains to determine which of Valbruna's remediation costs are necessary and consistent with the National Contingency Plan (NCP) such that they are compensable under § 107(a). Second is the issue of contribution. Here, the Defendants argue that, even though they are technically liable under § 107(a), it is nevertheless inequitable to require them to bankroll the cleanup effort. Phase I of this trial addressed the first of these issues (Phase II, which will address the second, is scheduled for June 12, 2017). Based upon its consideration of the testimony at trial and the other evidence submitted by the parties, the Court now enters the following conclusions of law and findings of fact as to Phase I of trial pursuant to Federal Rule of Civil Procedure 52:

## FACTS

The parties stipulated to the following facts:

1. From 1928 to 1981, Joslyn owned property located at what is presently identified as 2302 and 2400 Taylor Street f/k/a 1701 McKinley Avenue in Fort Wayne, Indiana (collectively, "Site") and operated a steel manufacturing facility on the Site ("Steel Facility") for all of those years.

2. On February 2, 1981, Joslyn sold the Site and Steel Facility to Slater Steels Corporation ("Slater").

3. In June 2003, Slater filed a Chapter 11 bankruptcy petition in the U.S. Bankruptcy Court for the District of Delaware ("Slater Bankruptcy").

---

[1] The Plaintiffs also brought a claim under Indiana's Environmental Legal Action statute, though the Court entered judgment for the defense on that count on claim preclusion grounds. [DE 35].

4. The soil and groundwater at and around the Site are contaminated with numerous hazardous substances, including chlorinated organic chemicals (e.g., TCE), semi-volatile organic chemicals, heavy metals, PCBs and radioactive elements related to historical operations at the Site.

5. Valbruna acquired the Site in April 2004 following an auction conducted as part of the Slater Bankruptcy.

6. FWSC acquired that portion of the Site presently identified as 2302 Taylor Street ("2302 Property"), and VSSC acquired that portion of the Site presently identified as 2400 Taylor Street ("2400 Property").

7. In April 2004, Valbruna and the Indiana Department of Environmental Management ("IDEM") entered into a Prospective Purchasers Agreement ("PPA"), which required Valbruna to spend approximately $1 million on Site investigation and remediation work in response to pre-existing contamination at and from the Site. Valbruna contributed $500,000 of the $1 million.

8. From 2005 to 2006, Valbruna conducted Electrical Resistance Heating ("ERH") utilizing the PPA funds to address volatile organic compound impacts at a portion of the Site where degreasing operations had historically occurred.

9. In June 2006, the U.S. Environmental Protection Agency ("U.S. EPA") inspected the Site in relation to its historical contamination issues.

10. By letter dated November 1, 2007, IDEM issued a Risk Assessment Review outlining the Site's remaining areas of environmental concern after the ERH work.

11. In 2008, VSSC and FWSC each entered their respective portions of the Site into IDEM's Voluntary Remediation Program ("VRP").

12. As part of participating in VRP, the applicants (VSSC and FWSC) and IDEM entered into separate Voluntary Remediation Agreements (collectively, "VRA") in March 2011.

13. Valbruna has never operated a melt shop at the Site or conducted any manufacturing operations at the 2302 Property.

14. Valbruna currently operates a steel rolling facility at the 2400 Property.

[DE 163 at 5-6]. The Court will set forth additional facts as they are relevant to its analysis below. Most of the evidence at trial was undisputed, though the Court also notes and explains its resolution of factual conflicts where necessary.

**ANALYSIS**

This phase of trial addressed which of Valbruna's expenses meet the requirements for compensability under CERCLA. To be recoverable, expenses must be both necessary and consistent with the National Contingency Plan. Costs are "necessary" if they are incurred in response to a threat to human health or the environment and they are necessary to address that threat. *G.J. Leasing Co. v. Union Elec. Co.*, 854 F. Supp. 539, 562 (S.D. Ill. 1994) *aff'd*, 54 F.3d 379 (7th Cir. 1995). This is an objective inquiry. *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 872 (9th Cir. 2001) ("In determining whether response costs are 'necessary,' we focus not on whether a party has a business or other motive in cleaning up the property, but on whether there is a threat to human health or the environment and whether the response action is addressed to that threat.").

A private party response action is consistent with the NCP if it is in substantial compliance with the requirements set forth in 40 C.F.R. § 300.700(c)(5) to (6) and results in a CERCLA-quality cleanup. 40 C.F.R. § 300.700(c)(3)(i). A state environmental protection agency's substantial involvement in a cleanup can also establish compliance with the NCP. *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 791 (7th Cir. 2000); *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, No. 1:10-CV-044, 2015 WL 8055999, at *6 n. 4 (N.D. Ind. Dec. 4, 2015); *Allied Waste Transportation, Inc. v. John Sexton Sand & Gravel Corp.*, No. 13 C 1029, 2016 WL 3443897, at *19 (N.D. Ill. June 23, 2016). Preliminary site-assessment and monitoring costs need not comply with the NCP. *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 617 (7th Cir. 1998); *Valbruna*, 2015 WL 8055999, at *6.

Joslyn argues that a number of Valbruna's costs do not satisfy these criteria. Specifically, it contests expenditures associated with: (1) an escrow contribution Valbruna made to buy the

site under a prospective purchasers agreement with the Indiana Department of Environmental Management, (2) environmental due diligence assessments conducted by Pioneer and RSSI, (3) demolition of the old melt shop, (4) installation of a vapor barrier at the old melt shop site, (5) radiological contamination surveys conducted by SAIC and AECOM, (6) removal of the passivation sump, (7) excavation and disposal of contaminated soil at the steel ingot storage area, (8) disposal of a PCB transformer and bunker oil tanks and (9) costs that purportedly exceed Valbruna's own cost-tracking records. At this phase of trial, Joslyn does not challenge any other expenses. The Court addresses each category of disputed costs in turn.

*Prospective Purchasers Agreement Contribution*

Joslyn first argues that the $500,000 Valbruna paid into escrow under a prospective purchasers agreement with the Indiana Department of Environmental Management (IDEM) is not compensable. The agreement provided that the escrow funds would be used to remediate the site. It also protected Valbruna from further environmental action by IDEM (though not the EPA). Joslyn says this was a calculated expense that Valbruna incurred to acquire the site. Such commercially motivated expenditures, it contends, are not compensable under *G.J. Leasing*, 854 F. Supp. 539.

The Court already rejected this argument on summary judgment. In a prior order, the Court concluded that *G.J. Leasing* referenced the business motivation underlying a cleanup effort not because it determined compensability, but because it underscored the absence of a public health threat. This Court further found that even if it did "subscribe to Joslyn's interpretation of *G.J. Leasing*, it still would not find subjective motivation to be a relevant consideration in the necessary cost calculus." [DE 124 at 8] (citing *Carson Harbor*, 270 F.3d at 872). That approach has since received further support in this circuit. *Allied Waste*, 2016 WL 3443897, at *18

("Additionally, as the Ninth Circuit has explained, as long as the costs were incurred in response to a threat to human health or the environment, and the actions were taken to address that threat, the underlying motivation for incurring costs is irrelevant."); *see also MPM Silicones, LLC v. Union Carbide Corp.*, No. 1:11-CV-1542, 2016 WL 3962630, at *23 (N.D.N.Y. July 7, 2016) ("The fact that MPM undertook its project at the WWTU with a business purpose in mind is not determinative: In determining whether costs are necessary, the focus is not on whether a party has a business or other motive for cleaning up the property, but on whether there is a threat to human health or the environment and whether the response action is addressed to that threat.") (internal quotation marks omitted). As such, the motivation behind the escrow contribution does not affect Valbruna's ability to recover it from Joslyn under § 107(a).[2]

Further, the escrow contribution funded work that was necessary and consistent with the NCP. It was used to conduct electrical resistance heating (ERH) remediation, which is a means of removing TCE from contaminated soil and groundwater. The parties have stipulated that TCE is a hazardous substance. IDEM viewed removing it as the highest priority at the site in light of its potential to migrate. [DE 170 at 84]. The ERH remediation was ultimately successful, removing more than ninety-three percent of TCE contamination. [DE 169 at 184-85].[3] IDEM's Andrea Robertson-Habeck further opined that the escrow funds were reasonably spent. [DE 170

---

[2] The motivation underlying the escrow contribution (as well as other considerations not relevant under § 107(a)) may nevertheless be relevant to the contribution phase of trial. *See NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 700 (7th Cir. 2014) (noting that the district court has broad discretion to identify and weigh relevant equitable considerations in allocating costs under § 113(f)).

[3] Valbruna's environmental consultant, Matthew Dagon of Stantec, testified that electrical resistance heating remediation removed only about half of the TCE from the soil. [DE 169 at 162]. However, the Court finds that approximately ninety-three percent of the TCE was removed from the soil, as evidenced not only by the testimony cited above, but also by the report submitted by the contractor that performed the ERH work. *See, e.g.*, ex. 7 at 2 (indicating that "Clayton Agreed to remove 90% of the mass TCE in the remediation area [and that] . . . all the goals described in the work plan had been met.") But even if the TCE remediation had been less successful, the evidence would still demonstrate that the PPA funds were reasonably spent to address an environmental threat.

at 81-82]. The evidence thus demonstrates that the escrow contribution directly addressed a threat to human health and the environment.

The escrow work was also consistent with the NCP, since IDEM was comprehensively involved with it. [DE 170 at 80]. IDEM initially approved the ERH remediation strategy, actively supervised it and then reviewed its results. [DE 170 at 79-81]. Indeed, Valbruna's environmental expert, John Mundell, testified that IDEM examined the escrow expenditures "with a very fine-tooth comb" because it felt obligated to ensure that they were well used. [DE 170 at 134]. This was sufficient to ensure that the cleanup met CERCLA standards. The Court accordingly concludes that Valbruna's $500,000 contribution is compensable under § 107(a).

*Pioneer and RSSI Investigations*

Joslyn next contests the fees Valbruna paid to two environmental consultants, Pioneer and RSSI. Valbruna commissioned these companies to perform environmental due diligence prior to closing on the site. Valter Viero, a Valbruna officer, testified that Pioneer first conducted a routine Phase I assessment at a cost of about $2,000. When that revealed potential environmental issues, Valbruna commissioned a more thorough Phase II assessment through Pioneer and a radiological contamination survey through RSSI. [DE 169 at 28-29]. Joslyn argues that Valbruna should not be able to recover the expenses associated with these assessments because they were incurred to evaluate Valbruna's risk in buying the property rather than to mitigate a threat to human health or the environment.

This is simply another permutation of Joslyn's argument regarding the escrow funds. For reasons already noted, the Court does not find Valbruna's motivation in ordering the site assessments relevant at this phase of trial. Rather, the inquiry is whether they were commissioned in response to a threat to human health or the environment and were necessary to

7

address that threat. Evidence at trial indicated that they were. The Phase I assessment was a broad, inexpensive survey of environmental issues. It yielded some areas of concern that Valbruna then investigated in greater detail. The Phase II assessment focused on the presence of TCE at the site. [DE 169 at 30]. Consistent with the above discussion, that was indisputably a serious environmental problem. The RSSI assessment investigated radiological contamination. It was reasonable to conduct that in light of the Phase I assessment, which revealed that Joslyn had previously used the site to roll uranium and indicated the potential presence of radiological contamination. [DE 169 at 62, 95]. This is true even if radiological contamination at the site did not ultimately require remediation. *See Cont'l Title Co. v. Peoples Gas Light & Coke Co.*, No. 96 C 3257, 1999 WL 753933, at *3 (N.D. Ill. Sept. 15, 1999) (noting that site assessment and monitoring costs are compensable even absent any subsequent recoverable response costs).

Further, these assessments appear to have been both cost effective and useful. IDEM's Robertson-Habeck testified that due diligence information is generally helpful in defining where contamination is located at a particular site. [DE 170 at 73]. And Plaintiffs' expert Mundell testified that the due diligence assessments were a reasonable means of conducting investigatory work, which is a standard component of remediation. [DE 170 at 136-39]. The RSSI assessment also led to further examination of the site by the U.S. Army Corps of Engineers and the enrollment of the site in the Formally Utilized Sites Remedial Action Program. [DE 169 at 35]; [DE 170 at 15-16]. The Court thus concludes that the costs associated with the Pioneer and RSSI assessments were necessary. *See Norfolk S. Ry. Co. v. Gee Co.*, No. 98 C 1619, 2002 WL 31163777, at *35 (N.D. Ill. Sept. 30, 2002) ("At the time of the Phase I and Phase II investigations, Norfolk was trying to determine the full extent of contamination at the site and did not know the full extent of the CCA contamination. Thus, the court is not willing to limit

Norfolk's recovery for this investigative work because it was a necessary step in a successful response action."). They are therefore compensable, since initial site assessment costs need not be consistent with the NCP. *Valbruna*, 2015 WL 8055999, at *6.[4]

*Melt Shop*

Joslyn next disputes the compensability of costs Valbruna incurred to raze an old melt shop. It argues that Valbruna did this to construct a new building at the site, rather than to mitigate an environmental or public health threat. Valbruna responds that the melt shop was contaminated, posed a hazard and was "coming down whether we wanted it or not." [DE 170 at 167].

The evidence does not support Valbruna's position. While Valbruna argues that the melt shop was inevitably coming down, it has not designated any evidence to support that contention. More importantly, it is unclear what, if any, threat the melt shop posed either as it existed or if it had collapsed or how demolishing it otherwise advanced remediation of the site. Though the groundwater in that area was contaminated, *see, e.g.*, [DE 169 at 147], there is no evidence that the building itself posed an environmental harm. It did contain asbestos, [DE 170 at 28], but asbestos is not a threat absent a risk that it could escape into the environment. *See Sycamore Indus. Park Assocs. v. Ericsson, Inc.*, 546 F.3d 847, 851–53 (7th Cir. 2008) (finding no "disposal" or "release" of asbestos where it was "either inside a building or enclosed in a pipe chase or metal case" and "even if the asbestos broke off, asbestos fibers would remain in the building."); *G.J. Leasing*, 854 F. Supp. at 562 (finding costs to remove asbestos unnecessary where there was no evidence that it threatened to contaminate nearby grain or water). Indeed,

---

[4] Some courts have held that costs incurred prior to the discovery of contamination do not qualify as site assessment costs. *See, e.g.*, *VME Americas, Inc. v. Hein-Werner Corp.*, 946 F. Supp. 683, 693 (E.D. Wis. 1996). Here, however, contamination had clearly been identified at the site prior to the Phase I assessment, as Valbruna bid on the site knowing it would be sold under a remediation agreement with IDEM. *See* [DE 169 at 55-56].

Valbruna's environmental manager indicated that IDEM never ordered Valbruna to demolish the melt shop. [DE 170 at 15]. Rather, Valbruna demolished the melt shop in order to construct a new finishing operation building. [DE 170 at 13]. While expenses that facilitate new construction are not *per se* noncompensable, they are where, as here, they do not concurrently mitigate a threat to human health or the environment. *G.J. Leasing*, 54 F.3d at 386 (CERCLA cannot be invoked "to improve one's property and charge the expense of improvement to someone else"). As such, Valbruna cannot recover the funds it spent to demolish the melt shop.

*Vapor Barrier*

Once Valbruna demolished the old melt shop, it constructed a new building where the melt shop had stood. As part of that process, Valbruna installed a "spray-on membrane" between the new building and volatile organic chemicals in groundwater beneath it. [DE 169 at 134-36]; [DE 170 at 44]. This acted as a protective barrier, which prevented chemical vapors from wafting up into the building "at concentrations that might be above a health protective indoor air concentration." [DE 169 at 136].

Joslyn rightly disputes the compensability of this expense. Ensuring safe working conditions is not within the scope of CERCLA. *G.J. Leasing*, 854 F. Supp. at 562 (holding that employee exposure to asbestos is not the sort of threat redressable under CERCLA, but rather is an OSHA concern). To be compensable, expenses must address a broader threat to human health or the environment. *Id*. Of course, these interests are not necessarily mutually exclusive. There may be instances in which a cleanup effort eliminates a threat to human health or the environment and in doing so also benefits worker safety. Here, however, the evidence indicates that the vapor barrier served only the latter function. It did not eliminate or contain the contaminated groundwater. [DE 169 at 156] (Valbruna's environmental consultant Matthew

Dagon: "A: . . . we placed a vapor barrier. Q: You haven't treated the actual VOCs in the ground as of today; true? A: In that area of the site? Q: Yes. A: That's right."); [DE 170 at 45] (Valbruna's environmental manager indicating that there "wasn't actually any remediation done of the VOCs; they just put this barrier in to protect the inhabitants of the building."). For that matter, the vapor barrier did not even completely contain the vapors emerging from the groundwater. Rather, it was installed only over the section of the new building that was going to be manned. [DE 169 at 135-36]. As such, the expenses Valbruna incurred to construct it are not necessary within the meaning of CERCLA and thus are not compensable.

*SAIC and AECOM Studies*

For similar reasons, the expenses associated with the SAIC and AECOM assessments were not necessary. While the evidence at trial regarding these assessments was scant, it indicated that both tests were performed to protect worker safety. Valbruna's environmental manager, Jonathan Hacker, testified that Valbruna commissioned the AECOM study "so that we feel comfortable in the demolition [of the melt shop], people's potential exposure to radiation, and future workers' exposure to that." [DE 170 at 21]. As to the SAIC study, Hacker testified that this too was conducted "to ensure that there was no radiological exposure to workers." [DE 170 at 37]. He further indicated that the SAIC study was not ordered by IDEM. *Id*. Thus, these studies were performed to ensure that conditions were suitable for Valbruna employees. Though the AECOM study seems to have also furthered the demolition of the melt shop building, that does not render it compensable since, as discussed above, the demolition of the melt shop was itself unnecessary. Moreover, there is no evidence that either the AECOM assessment or the SAIC assessment materially assisted in determining the need for remediation work or planning

or executing remediation work. As such, the expenses Valbruna incurred in association with them are not compensable.

*Passivation Sump*

Joslyn next contends that it should not be liable for costs associated with removing the passivation sump and remediating the area around it. It argues that the costs relating to the passivation sump removal are capable of apportionment, as the contamination at issue was not released during Joslyn's ownership of the site. Further, it says that many of the costs associated with remediation of the passivation area are not compensable because they were not consistent with the NCP and IDEM was not substantially involved with them.

Neither of Joslyn's arguments is well taken. While a CERCLA defendant can escape liability to the extent certain costs are divisible, the time for making such an argument has long since passed. Divisibility is a defense to joint and several liability. *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 614 (2009). However, the Court already found Joslyn jointly and severally liable for Valbruna's response costs on summary judgment. [DE 124 at 13] ("That means that Joslyn is jointly and severally liable for Valbruna's response costs."). Further, at the final pretrial conference both parties explicitly confirmed that they did not intend to present any evidence of divisibility. Since Joslyn has not indicated why it could not have previously foreseen that a divisibility defense would be necessary with the exercise of due diligence, the Court will now hold it to its previous representation. *See* 6A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1527 (3d ed. 2010) ("Courts generally hold stipulations, agreements, or statements of counsel made at the pretrial conference binding for purposes of the trial.").[5]

---

[5] While Joslyn relies on *U.S. v. P.H. Glatfelter Company* for the proposition that it should now be permitted to advance a divisibility argument, that case isn't even remotely similar to this one. 768 F.3d 662 (7th Cir 2014).

Even if the Court were to reach this issue, Joslyn misunderstands the nature of divisibility. It argues that "there is no evidence that the hole caused a release during the time Joslyn owned and operated the site." [DE 174 at 24]. But an absence of evidence is not sufficient for Joslyn to avoid liability. Rather, "CERCLA defendants seeking to avoid joint and several liability bear the burden of proving that a reasonable basis for apportionment exists." *Burlington*, 556 U.S. at 614. Joslyn has failed to meet that burden. Joslyn also does not deny that it made use of the sump on the property. So, even if another party subsequently used or failed to maintain it, that would not necessarily relieve Joslyn of liability under CERLCA's strict liability regime. *See id.* ("where two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm"). Accordingly, the Court rejects Joslyn's divisibility defense.[6]

That leaves Joslyn's argument that the costs associated with the removal of the passivation sump were not all consistent with the NCP. Specifically, Joslyn says that IDEM was not involved in the removal of rainwater from the sump or the initial removal of the sump itself and the associated disposal of acid solids. Rather, it says IDEM only became involved with this operation when Valbruna discovered a tennis-ball-sized hole in the sump during the process of excavating it. As such, Joslyn argues that costs incurred before the discovery of the hole are not consistent with the NCP.

However, the evidence indicates that IDEM's involvement with the passivation sump was broader than Joslyn represents. The passivation area was initially identified as an area of

---

There, the "trial focused on the defendants' divisibility defenses." *Id*. at 675. Here the parties agreed at the final pretrial conference that divisibility would not even be an issue at trial.

[6] Relatedly, Joslyn's argument that it did not dispose of various contaminants, including passivation acid, is misplaced. *See P.H. Glatfelter*, 768 F.3d at 674 ("Where Glatfelter's argument goes astray is in its assumption that the government must prove all of the elements of liability in relation to each operable unit of the Site. Such a requirement is nowhere to be found in the statute.").

concern in a 2002 voluntary remediation agreement with IDEM (though at that time IDEM indicated that no action was required because the tanks were "in a concrete overflow pit that appear [sic] to be in good condition"). Ex. 10,038 at 44. In 2012, IDEM raised concerns in its comments to Valbruna's proposed remedial work plan that it believed this area had not been sufficiently investigated. Ex. 23 at 1; *see also* [DE 169 at 150].[7] Valbruna subsequently decided to remove the sump between 2013 and 2014. As part of that effort, Stantec, Valbruna's environmental consultant, "put together a cleanout plan, submitted it to IDEM for their review and answers, got some comments back on it, and then [Valbruna] proceeded to clean the passivation sump out." [DE 170 at 12]. IDEM's James Lam also testified (albeit somewhat cursorily) that he was "involved in review of [the work in the passivation area] before it was performed." [DE 170 at 106].[8] To the extent any of this work may have been deficient, Lam also testified that IDEM will review the results of the cleanup at the site generally, decide whether relevant cleanup standards are met and accordingly determine when cleanup is complete. [DE 170 at 107]. In aggregate, this demonstrates sufficient IDEM involvement to satisfy the NCP compliance requirement.

There also seems little doubt that these expenses were necessary. The sump had a hole in it which could have permitted passivation acids to enter the ground. *See, e.g.*, [DE 170 at 58]. Those acids contained traces of heavy metal, which the parties have stipulated is hazardous. [DE 169 at 158]. Further, the building around the sump was deteriorating. So, the sump collected

---

[7] The Court received this testimony subject to an objection as to undisclosed expert testimony. However, as is relevant here, Dagon does not offer an expert opinion. He only provides a factual account of communications received from IDEM and the Plaintiffs' response to them.

[8] Dagon testified that, after discovering the hole in the sump, Stantec drafted a soil-excavation work plan and submitted it to IDEM. [DE 169 at 133]. It is possible that the testimony quoted above refers only to this work. However, it seems considerably broader than that. Further, the latter interpretation is not inconsistent with Dagon's testimony, as Dagon does not indicate that IDEM's involvement with the passivation sump project was limited to work performed after the hole was discovered.

14

rainwater, which became contaminated with acids and regularly had to be removed before it overflowed. [DE 170 at 31].[9] Joslyn's only argument that the expenses associated with the passivation sump were not necessary is that Valbruna removed the passivation sump to facilitate new construction. It points out that Valbruna was not even aware of the hole in the sump before it began dismantling it. But as discussed, a party's motives do not control the necessary cost inquiry. What matters is that funds were reasonably spent to mitigate a threat to human health or the environment. Here, the removal of the passivation sump mitigated the threat that passivation acids tainted with heavy metals would leech into the ground. The funds expended in association with that effort are thus compensable.

*Steel Ingot Storage Area*

Joslyn next argues that Valbruna's expenses for excavating and removing contaminated soil at the steel ingot storage area are not compensable. It again argues that these expenses were incurred to facilitate new construction. That much is true—Hacker testified that Valbruna removed the soil as part of an effort to construct a new ingot storage area in 2013. [DE 170 at 43]. Further, environmental remediation would seem to have been an afterthought, as Stantec's Dagon testified that Valbruna initially sought to dump the soil it executed elsewhere on the site. Only after IDEM informed Valbruna that it would have to take the contaminated soil offsite for disposal did Valbruna do so. [DE 169 at 132].

Nevertheless, it does not matter why Valbruna removed the contaminated soil, so long as doing so was a reasonable means of mitigating a threat to human health or the environment. The evidence indicates that it was. Both Valbruna's environmental manager and IDEM's Lam

---

[9] The disposal of the contaminated rainwater was also necessary and consistent with the NCP. It was necessary because the overflowing rainwater posed a risk of emitting contaminants into the environment. It was consistent with the NCP in light of IDEM's general involvement at the site and Hacker's testimony that IDEM required the disposal of the rainwater. [DE 170 at 59].

15

testified that the soil at the ingot storage area was contaminated with metals. [DE 170 at 43] (Hacker indicating that "metallic contaminated" soil was excavated from the site in 2013); [DE 170 at 105-06] (Lam indicating he was aware of "contamination in what we call the ingot storage area"); *see also* [DE 170 at 142] (Mundell implying that the ingot storage area was a "heavy metal hot spot").[10] Further, this contamination posed an environmental threat. *See, e.g.*, [DE 170 at 108] (Lam indicating that the impacts to the soil at the ingot storage area posed a threat); [DE 170 at 84] (Robertson-Habeck testifying that, while the metals at the site were not a high priority, they would need to be addressed at some point). The evidence also indicates that Valbruna's decision to excavate and remove the soil rather than, for example, managing the contamination through a containment strategy or in situ remediation, was cost effective and efficacious. Valbruna's expert offered uncontested testimony that targeted removal is "very effective" and "often cheaper" than in situ remediation. [DE 170 at 142-43]. And IDEM's James Lam testified that "disposal off-site at a landfill [was] a reasonable way to address [the] threat." [DE 170 at 108]. As such, the evidence demonstrates that metal contamination at the steel ingot storage site posed an environmental threat, which Valbruna addressed through cost effective means.[11]

---

[10] Hacker also testified that, according to the remedial work plan for the site, "No surface soil concentrations of metals exceeding the industrial direct contact screening level have been identified. One subsurface soil sample exceeded the industrial direct contact screening level." [DE 170 at 42]. However, that does not alter the analysis here. He elaborated that direct contact is just one limit out of many that IDEM uses. He also explained, consistent with the testimony above, that metallic concentrations at the site exceeded restrictions other than the direct contact limit set by IDEM. [DE 170 at 60-61].

[11] *Regional Airport Authority* upon which defense counsel seeks to rely is distinguishable in at least two respects. First, while the site here contained hazardous metals, the site at issue in that case did not require *any* remediation. *Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 704-05 (6th Cir. 2006) ("There is no evidence in the record demonstrating the need for a CERCLA-quality cleanup prior to constructing the runway . . . none of these reports indicated that the Site, as it sat when the Authority took control, needed remediation to protect the public health or the environment."). Second, in *Regional Airport Authority* "the 'response costs' and the runway construction costs were one and the same." *Id*. at 705. In contrast, much of the cost Valbruna incurred with regard to the ingot storage area paid for the hauling and disposal of contaminated soil. Valbruna would not have incurred that expense (or at least would have spent less) had it been allowed to simply relocate the soil as it had originally

Joslyn also says that these expenses were not consistent with the NCP and that there is no evidence IDEM was substantially involved so as to satisfy that requirement. The most persuasive evidence in its favor is that the excavation occurred before Valbruna had arrived at a plan for tackling the site's metallic contamination with IDEM. [DE 169 at 148] (Stantec's Dagon testifying that Valbruna's work at the ingot storage area "got ahead of the Soil Management Plan" with IDEM). [DE 169 at 148]. But IDEM was nevertheless substantially involved. It reviewed Valbruna's plan to relocate excavated soil onsite, rejected it and instead required Valbruna to landfill the contaminated soil. [DE 169 at 132-33]. It was thus the very reason why the lion's share of the work at the ingot storage area occurred. Under those circumstances, it is difficult to conclude that its oversight was insufficient. The Court accordingly finds that these expenses are compensable.

*Bunker Oil Tanks and PCB Transformer*

Joslyn also argues that two other expenses Valbruna incurred were not necessary or consistent with the NCP. First, it points to the disposal of old bunker oil tanks and the concrete saddles upon which they rested. Second, it identifies Valbruna's disposal of a PCB transformer and associated oil and debris.

The Court finds that these expenses are not compensable. There was very little testimony at trial about them. Witnesses did testify that both the bunker oil tanks and the PCB transformer contained hazardous substances (the former fuel-oil sludge and the latter oil containing PCBs). However, there was no testimony that either of these substances were at any risk of escaping into the environment such that they would pose a threat. The PCB oil was presumably confined

---

planned. Finally, to the extent *Regional Airport Authority* nevertheless stands for the proposition that motive can control the necessary cost inquiry, the Court declines to follow it consistent with the analysis of *Carson Harbor* and *G.J. Leasing* set forth above.

inside of the transformer. And the sludge was not at imminent risk of escape, as it had been inside of the bunker oil tanks since the 1950s. [DE 170 at 55]. As such, these contaminants appear to have been contained such that remediating them was not necessary to address an environmental threat. *See G.J. Leasing*, 854 F. Supp. at 562.[12]

*Amounts in Excess of Stantec Estimates*

Finally, Joslyn argues that Valbruna seeks reimbursement for expenses which purportedly exceed those Valbruna incurred as documented by its own records. Specifically, Joslyn points to "cost-tracking" sheets, which indicate that Valbruna has incurred $224,221.18 less than the expenses it now claims (excluding the $500,000 escrow contribution and other disputed costs listed above, which are not included in these cost-tracking statements). Joslyn argues that these expenses are not reimbursable as "none of Valbruna's witnesses provided specific facts to demonstrate how [this] $224,221.18 was spent." [DE 174 at 16].

This argument is not well taken. Evidence at trial indicated that these cost-tracking records are not all inclusive because they are limited to costs incurred by Valbruna's environmental consultant, Stantec. Valbruna incurred costs from parties other than Stantec, including from the local contractors it hired to cut costs. [DE 170 at 57]; [DE 170 at 10-11]. Indeed, Joslyn acknowledged this following closing arguments when it all but conceded the argument it now makes. [DE 170 at 165].

Further, Valbruna provided documentation to substantiate all of its costs. *See* ex. 33, 34 (itemization of expenses); Ex. 10,654-10,678 (invoices for itemized expenses). It likewise

---

[12] Dagon did testify that there were "two horizontal above-grade storage tanks" that "had to be removed as part of [the] activity" at "Number 4," which is a region that contained PCB-contaminated soil. [DE 169 at 137]. Conceivably, this could be read to imply that removing the bunker oil tanks was necessary to effectuate PCB remediation. But there is no other testimony in the record to this effect. Standing alone, Dagon's testimony is too vague and conclusory to support a finding that these sums were necessary to address an environmental threat.

provided evidence that its costs have generally been both necessary and consistent with the NCP. Since the electrical resistance heating remediation, Valbruna's cleanup has been conducted under the auspices of the IDEM Voluntary Remediation Program. *See* ex. 15-16. That program involves significant supervision and comment by IDEM and ultimately will require IDEM approval to complete. *See, e.g.*, ex. 23-26; [DE 170 at 128-132]; [DE 170 at 93-94]. Valbruna's expert also testified that he reviewed Valbruna's invoices and found them "all within reasonable ranges" and that they all served to mitigate an environmental threat. [DE 170 at 145-46].[13] In fact, defense counsel directly acknowledged that, outside of certain costs discussed above, no "costs that the plaintiffs seek to be reimbursed for are unrelated to removal of contamination." [DE 170 at 176]. As such, the Court finds that all of Valbruna's expenses, other than those specifically exempted in the analysis above, were necessary and consistent with the NCP. Joslyn's objection to the $224,221.18 not documented in Stantec's cost-tracking estimates is accordingly not well taken.

*Summary of Phase I Findings*

The Court finds the expenses associated with the melt shop ($88,019.39), the vapor barrier ($25,000), the SAIC ($12,500) and AECOM ($19,730) radiation surveys, the bunker oil tanks ($13,201.15) and the PCB transformer ($22,930.29) are not compensable. Valbruna's remaining expenses are compensable. Subtracting the disallowed costs from Valbruna's claimed expenses of $2,211,251.92 yields total damages of $ 2,029,871.09, subject to contribution. This

---

[13] This does not alter the Court's conclusion that the expenses associated with the bunker oil tanks and PCB transformer are not compensable since, as noted above, the contaminants inside of these items seem to have been contained. Thus, while removing them may have been environmentally beneficial, it did not mitigate an environmental threat in the sense required by CERCLA. In contrast, the other contaminants remediated by Valbruna appear to have been in the open environment such that cleaning them up did address an environmental threat. *See, e.g.*, [DE 163 at 6] (stipulating that the "soil and groundwater at and around the Site are contaminated with numerous hazardous substances, including chlorinated organic chemicals (e.g., TCE), semi-volatile organic chemicals, heavy metals, PCBs and radioactive elements.").

does not include interest or attorneys' fees, which the parties have agreed to resolve at a future proceeding. It also does not include any costs incurred after December 14, 2016.

SO ORDERED.

ENTERED: May 12, 2017

                                             /s/ JON E. DEGUILIO
                                       Judge
                                       United States District Court