UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| VALBRUNA SLATER STEEL CORPORATION and FORT WAYNE STEEL CORPORATION, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Case No. 1:10-CV-044 JD |
| JOSLYN MANUFACTURING COMPANY, JOSLYN CORPORATION and JOSLYN MANUFACTURING COMPANY, LLC, | ) ) ) ) ) ) |
| Defendants. | ) |

## OPINION AND ORDER

This case arises under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq*. In response to a cost recovery claim filed by Valbruna Slater Steel Corporation and Fort Wayne Steel Corporation (collectively, "Valbruna"), Joslyn Manufacturing Company, Joslyn Corporation, and Joslyn Manufacturing Company, LLC (collectively, "Joslyn"), filed a contribution counterclaim under § 113(f). The Court heard that counterclaim in Phase II of a bench trial on June 12, 2017, and now enters its findings of fact and conclusions of law as to the same.

## BACKGROUND

This environmental litigation has endured for more than seven years. To summarize briefly, Valbruna owns a contaminated steel processing site, which it has spent a considerable sum to remediate. To recover its cleanup expenses under § 107(a), it sued Joslyn, which used to own the site for fifty plus years. The Court adjudicated that claim at Phase I of trial, finding Joslyn strictly liable to Valbruna for $2,029,871.09 in costs. The Court further disallowed

1

$181,380.83 in costs, determining that they were not necessary and/or were not consistent with the National Contingency Plan. [DE 175].

The resolution of that claim does not, however, end this matter. A defendant in a § 107(a) suit can "blunt any inequitable distribution of costs by filing a § 113(f) counterclaim," which requires "the equitable apportionment of costs among the liable parties, including the PRP that filed the § 107(a) action." *United States v. Atl. Research Corp.*, 551 U.S. 128, 140 (2007). Joslyn took such a course here, thereby requiring it to bear the burden of proof in demonstrating an entitlement to contribution. *NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 690 (7th Cir. 2014). Since the parties agree that the prima facie case has been satisfied as to liability under § 107 [DE 161], it remains only for the Court to equitably allocate costs under § 113(f). To that end, the Court held Phase II of trial on contribution issues on June 12, 2017. Based upon its consideration of the testimony at trial and the other evidence submitted by the parties, the Court now enters the following conclusions of law and findings of fact pursuant to Federal Rule of Civil Procedure 52:

## FACTS

The parties stipulated to the following facts:

1. From 1928 to 1981, Joslyn owned property located at what is presently identified as 2302 and 2400 Taylor Street f/k/a 1701 McKinley Avenue in Fort Wayne, Indiana (collectively, "Site") and operated a steel manufacturing facility on the Site ("Steel Facility") for all of those years.

2. On February 2, 1981, Joslyn sold the Site and Steel Facility to Slater Steel Corporation ("Slater").

3. In June 2003, Slater filed a Chapter 11 bankruptcy petition in the U.S. Bankruptcy Court for the District of Delaware ("Slater Bankruptcy").

4. The soil and groundwater at and around the Site are contaminated with numerous hazardous substances, including chlorinated organic chemicals (e.g., TCE), semi-volatile

organic chemicals, heavy metals, PCBs and radioactive elements related to historical operations at the Site.

5. Valbruna acquired the Site in April 2004 following an auction conducted as part of the Slater Bankruptcy.

6. FWSC acquired that portion of the Site presently identified as 2302 Taylor Street ("2302 Property"), and VSSC acquired that portion of the Site presently identified as 2400 Taylor Street ("2400 Property").

7. In April 2004, Valbruna and the Indiana Department of Environmental Management ("IDEM") entered into a Prospective Purchasers Agreement ("PPA"), which required Valbruna to spend approximately $1 million on Site investigation and remediation work in response to pre-existing contamination at and from the Site. Valbruna contributed $500,000 of the $1 million.

8. From 2005 to 2006, Valbruna conducted Electrical Resistance Heating ("ERH") utilizing the PPA funds to address volatile organic compound impacts at a portion of the Site where degreasing operations had historically occurred.

9. In June 2006, the U.S. Environmental Protection Agency ("EPA") inspected the Site in relation to its historical contamination issues.

10. By letter dated November 1, 2007, IDEM issued a Risk Assessment Review outlining the Site's remaining areas of environmental concern after the ERH work.

11. In 2008, VSSC and FWSC each entered their respective portions of the Site into IDEM's Voluntary Remediation Program ("VRP").

12. As part of participating in VRP, the applicants (VSSC and FWSC) and IDEM entered into separate Voluntary Remediation Agreements in March 2011.

13. Valbruna has never operated a melt shop at the Site or conducted any manufacturing operations at the 2302 Property.

14. Valbruna currently operates a steel rolling facility at the 2400 Property.

[DE 163 at 5-6]. The Court will set forth additional facts as they are relevant to its analysis below. Most of the evidence at trial was undisputed, though the Court also notes and explains its resolution of factual conflicts where necessary.

## ANALYSIS

In allocating costs under § 113(f), the Court has "broad and loose" authority both in

deciding which equitable factors will inform its decision and in the ultimate cost allocation determination. *NCR*, 768 F.3d at 695. In determining the relative contribution of the parties, courts must look to the "totality of the circumstances." *Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 326 (7th Cir. 1994) (reversing for failure to show an awareness of certain relevant factors before arriving at an equitable conclusion based on the record). Courts often consider the Gore factors, though are not restricted to them. *Envtl. Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 508 (7th Cir. 1992); *Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92, 123 (D.D.C. 2014), *aff'd*, 833 F.3d 225 (D.C. Cir. 2016). Courts may also consider traditional equitable defenses in contribution, even though they do not bar liability under CERCLA. *Town of Munster, Ind. v. Sherwin-Williams Co.*, 27 F.3d 1268, 1270 (7th Cir. 1994).

Valbruna argues principally for the application of the Gore factors. These are:

(1) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;
(2) the amount of the hazardous waste involved;
(3) the degree of toxicity of the hazardous waste involved;
(4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;
(5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and
(6) the degree of cooperation by the parties with Federal, State or local officials to prevent any harm to the public health or the environment.

*ENSCO*, 969 F.2d at 508. These factors underscore a central consideration in this matter: while Joslyn contaminated the Site extensively and over a prolonged period, Valbruna did not pollute at all. Indeed, as cases cited by Valbruna demonstrate, courts have often permitted non-polluting landowners to recover all of their cleanup costs from polluting prior owners. *See, e.g.*, *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776 (7th Cir. 2000); *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610 (7th Cir. 1998); *Franklin Cty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534 (6th Cir. 2001); *Padgett Bros. LLC v. A.L. Ross & Sons, Inc.*,

4

No. 1:10-CV-00858, 2014 WL 3547353 (S.D. Ind. July 17, 2014); *see also Burlington N. & S.F.R. Co. v. United States*, 556 U.S. 599, 602 (2009) (stating that CERCLA was designed to ensure that the costs of cleaning up hazardous waste sites "were borne by those responsible for the contamination") (internal quotation marks omitted); *Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369, 389 (3d Cir. 2013) (noting cases that have reasonably allocated a substantial portion of costs to parties that were directly responsible for releasing waste).

But while Joslyn's status as the sole polluting party in this case is entitled to substantial weight, the Court does not regard it as entirely controlling. This case involves a unique blend of equitable factors (including several counterarguments raised by Joslyn discussed below) that are not replicated in any of the cases cited above. *See NCR*, 768 F.3d at 696 (noting that contribution is a "fact-intensive inquiry" that is "particularly suited to case-by-case analysis") (internal quotation marks omitted). The cases cited by Valbruna are also distinguishable in that they involve plaintiffs that did not knowingly acquire contaminated property or plaintiffs that acquired property under an agreement that the prior owner would remain liable for environmental issues. *NutraSweet*, 227 F.3d 776 (contamination came from a neighboring landowner that dumped contaminants on the plaintiffs' property while the plaintiffs owned it); *PMC*, 151 F.3d 610 (prior owner retained environmental liabilities in contract of sale); *Franklin Cty.*, 240 F.3d 534 (landowner purchased property unaware that it contained a buried box filled with contaminants and the prior owner agreed to remain responsible for any "claims which may affect . . . any portion of the premises"); *Padgett Bros.*, 2014 WL 3547353, at *1 (landowners "never used chlorinated solvents at the Site, purchased the Site with no actual knowledge of the contamination, and . . . cooperated with IDEM in cleaning up the contamination"). In contrast,

5

Valbruna was well aware that the Site suffered from serious environmental issues prior to purchasing it.[1] It also bought the Site at a bankruptcy sale without any guarantees from Joslyn.[2] Accordingly, though the Court gives substantial weight to the fact that Joslyn polluted and Valbruna did not, other equitable factors also merit consideration.

The sixth Gore factor supports Valbruna as well. All evidence suggests that Valbruna has promptly and efficaciously cooperated with IDEM in cleaning up the Site. First, it contributed to the escrow account and engaged in TCE remediation under the PPA. Then, after it became apparent that the escrow funds would not suffice to remediate the Site, Valbruna enrolled the Site in IDEM's VRP and funded further cleanup efforts (albeit under the specter of EPA liability). In contrast, Joslyn has taken no steps to clean up the Site and has refused Valbruna's requests for assistance. That is significant, *see Franklin Cty.*, 240 F.3d at 549 (affirming cost allocation that weighed polluter's rejection of landowner's requests for cleanup assistance), though it is partially tempered by the fact that (as Joslyn argues) no government agency ever requested Joslyn's

---

[1] Valbruna argues that its purchase of known contaminated property without being responsible for the contamination qualifies it as an innocent landowner. [DE 180 at ¶¶ 43, 44]. The "innocent landowner" exception has historically allowed a party to sue for response costs under § 107 when it did not take part in the contaminating. *See e.g., NutraSweet,* 227 F.3d at 784 (listing cases); *AM Int'l, Inc. v. Datacard Corp.*, 106 F.3d 1342, 1347 (7th Cir. 1997) (allowing suit for response costs by a party who presumably paid a discounted price for property it knew was going to be an expensive cleanup, and noting that such facts may have rendered the purchaser "a little less innocent"). Despite the fact that Valbruna has wholly failed to explain why the underlying facts supporting application of this exception in a cost recovery action would absolve it from any contribution under § 113, the Court considers those same underlying facts in arriving at its equitable conclusion based on the totality of the circumstances. *NCR,* 768 F.3d at 700-03.

[2] Joslyn did offer certain indemnities to Slater, though Valbruna did not acquire the right to sue on them under the asset purchase agreement. [Exb. 10,556 at Annex A (indicating that the APA excluded Slater's rights under the Joslyn lawsuit from the sale)]. It is also unclear whether they would have covered the contamination at issue. Though Slater invoked them in its case against Joslyn, that case was later dismissed for failure to prosecute.

participation, *see NCR*, 768 F.3d at 702 (noting cooperation with government cleanup effort as potentially relevant to the contribution decision), and Joslyn never attempted to hide the property's contaminated condition.

Beyond this, the Gore factors are of limited utility in this case.[3] They focus primarily on apportioning liability between two or more polluting parties, which is not a circumstance presented here. Further, while the parties agree Slater (which bought the Site from Joslyn and then sold it to Valbruna in a bankruptcy sale) also contaminated the Site, there is no evidence that sheds light on Slater's contributions relative to Joslyn's.[4] Accordingly, the Court turns to remaining equitable considerations not reflected by the Gore factors.

Most notably, Joslyn raises windfall and *caveat emptor* arguments, now more prominently referred to in their proposed findings [DE 181] as "assumption of risk." As to the former, it is generally true that "when a buyer knows of a cleanup liability prior to purchase, proper allocation under the equitable factors of § 113(f)(1) requires that the PRP buyer not be relieved of the entire expense of cleanup." *W. Properties Serv. Corp. v. Shell Oil Co.*, 358 F.3d 678, 691 (9th Cir. 2004), *abrogated on other grounds*, *Kotrous v. Goss-Jewett Co. of N. Cal.*, 523 F.3d 924 (9th Cir. 2008); *accord Smith Land & Imp. Corp. v. Celotex Corp.*, 851 F.2d 86, 90 (3d Cir. 1988) ("if the tract's price is reduced to allow for future environmental cleanup claims,

---

[3] Joslyn also argues that it complied with all environmental regulations that existed at the time it owned the Site. That could be relevant to the fifth Gore factor. However, the evidence on this point was sparse at trial. Moreover, assuming Joslyn's representation to be true, the Court still finds it inconsequential. Even if Joslyn complied with all relevant environmental regulations during its period of ownership, it still dumped the contaminants that ultimately required a major cleanup effort. And, it matters not that CERCLA was enacted after the dumping by Joslyn took place, as Joslyn can still be held responsible for payment of the subsequent cleanup. *See, e.g., NCR*, 768 F.3d at 686-703.

[4] This subject is also addressed below with respect to the equitable factors identified by the parties as orphan shares and divisibility.

the purchaser should not be entitled to double compensation"). Accordingly, Joslyn says that permitting Valbruna to recover its cleanup costs would amount to a double recovery, since Valbruna already received a price break when it knowingly bought contaminated property and essentially assumed the risks involved with the possibility of future cleanup requirements and costs.

Valbruna clearly knew the Site suffered from serious environmental problems before purchasing it (and thus, as Joslyn contends, foresaw the need for some cleanup), although Valbruna argues it was unaware of the full extent of contamination. [DE 180 at ¶ 20]. The Site had previously been the subject of an IDEM action against Slater [Exb. 37] and Keramida's subsequent environmental investigation and Remedial Work Plan [Exbs. 103, 105]—and much of those findings were set forth in the PPA that Valbruna signed. [Exb. 3 at 2]. Further, that agreement indicated that the Site was contaminated with "chlorinated hydrocarbons, polychlorinated biphenyls, metals, and semi-volatile organic compounds in soil, sediment and groundwater." [Exb. 3 at 2; DE 181 at ¶ 28]. It also warned that environmental liability threatened to prohibit a timely sale of the property. [Exb. 3 at 3]. Moreover, Valbruna conducted substantial environmental due diligence before closing on the Site, including Phase I and Phase II environmental assessments. [DE 181 at ¶¶ 24-26]. And after closing on the Site, Valbruna hired Slater's environmental manager, who had also been employed by the Trustee of Slater's bankruptcy. Given Valbruna's knowledge of numerous contaminants present (the degree of which was not entirely clear), Valbruna divided ownership of the Site between two corporate entities to provide an additional measure of protection against potential environmental liability which Valter Viero, Secretary of the plaintiff entities, characterized as "not very probable." [Exb. 10,560; DE 169 at 67, 94; DE 181 at ¶¶ 34-39].

These environmental issues were almost certainly reflected in the Site's sale price to some degree. *See Shell Oil*, 358 F.3d at 691 ("No sensible person would pay as much for a property with a known liability as for one without, whether the price expressly discounted for the cleanup or not."). However, it is difficult to determine the extent of that discount. Joslyn has not provided any direct evidence of what the Site would have been worth without an environmental cloud hanging over it. For instance, they provide no valuation appraisal relative to the time of purchase. [DE 180 at ¶ 45]. It points only to two insurance policies Valbruna obtained after the sale (one negotiated in April 2004 which purportedly never came into effect and a second that became effective in June 2004), which assessed the Site's buildings and equipment at a replacement cost of approximately $80 million. [DE 179 at 49, 54]. As Mr. Viero repeatedly testified, though, the cost of replacing buildings and equipment can be much higher than their actual value. *See, e.g.*, [DE 179 at 52]. Valbruna also may have insured the Site for more than it was worth at the time of sale, as it subsequently spent significant funds to restore the plant from its idle state to operable condition. [DE 179 at 61-62, 78]. Indeed, with or without environmental liability, it appears unlikely that the Site was worth anywhere close to $80 million at the time it was sold, as prospective buyers were unwilling to purchase it from Slater for $20-30 million in late 2003, when the facility was operating and before it sat vacant over the winter months potentially without proper winterizing. [DE 179 at 39]. Further, as Valbruna argues in support of its contention that it paid fair market value for the Site [DE 180 at ¶ 45], Valbruna acquired the idled Site in a competitive auction, where its winning $6.4 million bid was just $100,000 more than that of its nearest competitor, an entity also experienced in steel production and the purchase of similar idle steel facilities. Moreover, with a team of experienced environmental businessmen and lawyers assisting Valbruna [DE 181 at ¶¶ 12-23], it would lack common sense to believe that

Valbruna didn't anticipate availing itself of the laws allowing it to recover cleanup costs from those parties actually responsible for releasing the hazardous wastes onto the Site—thus, making savvy purchasers like Valbruna and its nearest competitor more willing to pay closer to market value. Thus, these facts support the determination that the fair market value was something closer to the actual price paid, rather than the amount insured to replace an updated and operating facility.

Two other considerations make it even more difficult to determine the extent to which environmental issues affected the Site's sale price. First, it appears that the full scope of contamination was not evident at the time of the sale.[5] Most notably, a Remedial Work Plan reviewed by Valbruna's environmental consultant before closing did not reveal detectable PCB levels in the junk ditch region of the Site (though it did recommend additional tests in light of "laboratory detection limits in excess of ecological screening levels"). [DE 179 at 110-120; Exb. 10,105 at VAL002463-64, VAL002466, VAL003005, VAL003016; Exb. 1 at VAL003652]. It later became apparent that the junk ditch was contaminated with PCBs at a level unacceptable to IDEM and would require remediation. *See, e.g.*, [DE 169 at 151, 154-55; DE 170 at 84; Exb. 8 at 4].[6] Second, the PPA protected Valbruna from further action by IDEM once the $1 million escrow was depleted. Valbruna may thus have reasonably concluded that its environmental

---

[5] The Court does, however, note the uncertainty inherent in purchasing an old, heavily contaminated steel plant. In doing so, Valbruna was likely aware of at least a small possibility that environmental contamination would substantially exceed what it expected.

[6] The evidence supports such a finding despite the Court's giving of little weight to Mr. Viero's conclusory testimony that Valbruna did not know "the full extent of the contamination at the site at the time it acquired it." [DE 179 at 63]. Mr. Viero also testified that TCE concentrations at the Site exceeded what Valbruna had anticipated. [DE 169 at 84]. However, this testimony is similarly conclusory and not credible in light of the substantial diligence Valbruna conducted aimed at ascertaining the extent of TCE contamination. [DE 169 at 30].

exposure was limited and priced that consideration into its bid. Indeed, Mr. Viero testified that he was "shocked" when he realized that IDEM would require Valbruna to fund cleanup beyond its $500,000 escrow contribution under threat of EPA intervention. [DE 169 at 37-40]. That testimony is credible insofar as Valbruna believed EPA intervention to be an unlikely contingency. But Valbruna certainly recognized at least the possibility of federal intervention in light of the EPA's reservation of rights in the PPA. [Exb. 3]. Further, in an email forwarded to Valbruna, the EPA had explicitly indicated its position to Slater that the Site's purchaser would remain subject to environmental liability notwithstanding the PPA. [Exb. 10,538].

Thus, the Court gives some weight to the fact that the Site was almost certainly sold at a lower price than it would have been had it presented no environmental problems. However, that consideration is partially discounted due to the lack of evidence as to the abandoned Site's value independent of environmental issues, contamination that was unknown at the time of sale despite the performance of due diligence, and the liability protection offered by IDEM. However, the Court assigns little weight to Valbruna's argument that it purchased the property at a price that reflected indications by the government—which were made *after* the purchase—that remediation assistance might be offered under the Formerly Utilized Sites Remedial Action Program for cleaning up radiation contamination (which the pre-closing Pioneer investigation had revealed). [DE 169 at 35, 44-46, 62-64].

Joslyn's *caveat emptor* argument similarly contends that Valbruna assumed the risk that its liability would be greater than anticipated when it knowingly purchased a heavily contaminated property, even if the full extent of that risk was not clear at the time of sale. *See Town of Munster*, 27 F.3d at 1270 (citing *Smith Land* for the proposition that "caveat emptor is not a defense to liability for contribution but may be considered in mitigation of the amount

11

due"). There is some merit to that position. As a party that engaged in a risky transaction to capture an economic opportunity, Valbruna deserves to bear some exposure. *See Litgo*, 725 F.3d at 380 (affirming where the district court considered that a party "did not know specifically that there was TCE contamination, [but] was aware that there were significant environmental issues, and voluntarily assumed that risk"). Valbruna will also be the only party to "reap the benefits of the environmental cleanup of its property." *Alcan-Toyo Am., Inc. v. N. Illinois Gas Co.*, 881 F. Supp. 342, 347 (N.D. Ill. 1995); *see also Litgo*, 725 F.3d at 387. That said, Valbruna did not blindly accept the risk associated with the Site (unlike the plaintiff in *Alcan-Toyo* who conceded to never performing environmental investigations of the site, *see id.*). Rather, Valbruna conducted substantial diligence to map out the extent of contamination and then entered into an agreement designed to protect it against cleanup costs in excess of the escrow contribution. Thus, Valbruna's self-protectionism stands in distinct contrast from a purchaser who agrees to *indemnify* prior owners for future costs resulting from the presence of (foreseen or unforeseen) contamination on the property. *Kerr-McGee*, 14 F.3d at 328 (current owner knew of the pollution when it purchased the property and in the contract of sale it agreed to indemnify the predecessor and assumed liability for any claim concerning pollution). Under these circumstances, while Valbruna may deserve to incur some costs that exceeded its expectations, it should not have to bear all of them. This is particularly true in light of the credit it is due for "taking the risk and making the effort necessary to get the land cleaned up and marketable." *Shell Oil Co.*, 358 F.3d at 691.

Finally, Joslyn raises several equitable considerations that are less persuasive.[7] First, it makes a laches argument, in which it contends it has been prejudiced by Valbruna's delay in bringing suit. *See Town of Munster*, 27 F.3d at 1273 (noting that delay and prejudice are among the factors that a Court can consider in contribution). However, the evidence at trial indicated that Valbruna did not realize its environmental liability was likely to exceed its escrow contribution until November 2007, when IDEM identified remaining contamination requiring remediation after its Site visit in June 2006 (which forecasted future cleanup obligations). [DE 179 at 67]. It then sent Joslyn a demand letter in March 2008. [DE 179 at 68]. This suit followed in February 2010. That delay, while not ideal, is not egregious in the context of complex litigation. More importantly, there is no indication that Valbruna's delay caused Joslyn any prejudice.[8] While Joslyn initially contended that it had been prejudiced since it destroyed documents as a result of Valbruna's delay in bringing suit, it later retreated from that argument at trial. [DE 179 at 164]. In fact, it appears that all documents it destroyed were readily available from other sources. As such, the Court assigns this factor little weight.

Second, Joslyn contends that the Court should consider that Joslyn previously defended a similar action against Valbruna's privy, Slater, and won a judgment on the merits. While the

---

[7] Valbruna also raises an unavailing equitable consideration. At trial, it presented evidence that Joslyn has insurance that might pay for any environmental liability. It is true that possible considerations for making an equitable allocation decision include the financial resources of the parties, *see, e.g., ENSCO*, 969 F.2d at 509 (citation omitted), and the availability of insurance payments to prevent double recovery, *see NCR*, 768 F.3d at 707. However, in this case, these factors are less influential in affecting the allocation outcome since there is no indication that either party is insolvent or may otherwise be unable to independently pay its fair share, or that Joslyn's insurer will actually cover the cost for any liability found on Joslyn's part (despite providing coverage for its defense costs). [DE 179 at 144-46].

[8] Joslyn does argue that it incurred double litigation costs, though this contention is addressed in the discussion regarding the Slater suit below.

Court previously held that suit did not bar this one, [DE 35; DE 39], Joslyn nevertheless says that the prior litigation should be given some weight in the equitable calculus. Though the Court is unaware of any authority explicitly indicating that this could be relevant to equitable apportionment, it is mindful of its broad discretion under § 113(f) to consider any factors it finds relevant based on the facts of the case. *See NCR*, 768 F.3d at 696 ("We have resisted attempts to impose upon district courts a requirement to either include or to ignore any particular factors in its ultimate decision, even ones that might strike an unbiased observer as salient facts.").

Nevertheless, the Court ascribes little relevance to the Slater suit. That July 2000 action contained a state law Environmental Legal Action ("ELA") claim rather than a CERCLA claim, which Joslyn was able to swiftly weed out. In April 2001, the state court granted a motion to dismiss it, finding "no evidence that the legislature intended for [the ELA] to be applied retroactively." [DE 35 at 2] (alteration in original). That same logic would not have prevented a CERCLA claim from moving forward, as courts have consistently "found that Congress intended CERCLA to apply retroactively despite the lack of an explicit reference to retroactive application." *See, e.g.*, *Commercial Logistics Corp. v. ACF Industries, Inc.,* Case No. 4:04-cv-74, 2004 WL 2595880 (S.D. Ind. Nov. 10, 2004) (collecting cases); *ConocoPhillips Pipe Line Co. v. Rogers Cartage Co.*, No. 3:11-CV-497, 2012 WL 1231998, at *3 (S.D. Ill. Apr. 12, 2012). Thus, there was little overlap between the effort devoted to the ELA claim in the Slater suit and that expended to litigate the present CERCLA action. As such, claim preclusion's rationale of "prevention of repetitive litigation of what is essentially the same dispute" is largely inapplicable here. [DE 35 at 6]. Thus, having found that the defense has not satisfied the technical requirements for claim preclusion, the Court likewise concludes that there is no basis for providing significant weight to the Slater suit in equitable allocation.

Third, Joslyn argues that Valbruna ought to bear responsibility for Slater's share of the pollution. "When a court cannot assign an ideal measure of monetary responsibility to an otherwise responsible party—because, for example, that party is immune from suit, bankrupt, or defunct—this gives rise to an orphan share. A court may equitably allocate orphan shares among liable parties at its discretion." *Litgo*, 725 F.3d at 380 n. 4 (internal quotation marks and citation omitted). At trial, there was evidence that Slater used PCBs and TCE, and thus may have exacerbated the condition of the Site. However, neither party presented any evidence to quantify Slater's share of the contamination and the parties even agreed that the contamination was indivisible [DE 162]. There is thus no basis for assigning orphan shares to Slater. While Joslyn cites to *Envtl. Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 508 (7th Cir. 1992), to support its most recent argument that the Court could instead use a *pro rata* approach by relying on the periods of time that Joslyn, Slater, and Valbruna each owned the Site [DE 181 at 46-47], that is an arbitrary metric that is unconnected to those entities' environmental responsibility. Moreover, the result in *ENSCO* doesn't help Joslyn given that, in *ENSCO*, it was determined that because neither party had submitted evidence to support equitable factors besides fault (which isn't the case here), and given that there was no genuine issue as to who caused the vehicle accident, then the single party responsible for causing the accident (resulting in spilled polychlorinated biphenyls from electrical transformers) was solely responsible for the entire cost of the cleanup. *Id.* at 512. Furthermore, even if a portion of the contamination were clearly attributable to Slater, the Court sees no basis for apportioning Slater's shares disproportionately to Joslyn or Valbruna.

The apportionment of orphan shares accordingly would not alter the ultimate contribution determination.[9]

## CONCLUSION

Having considered all of the above factors, it remains only to allocate costs. From the $2,029,871.09 in costs recoverable under § 107(a), the Court deducts the $500,000 associated with Valbruna's escrow contribution (even if the funds were handled differently than the purchase price for accounting purposes). While that sum advanced remediation, it was a known expense and functionally part of the purchase price of the Site. Permitting Valbruna to recover it from Joslyn would essentially amount to a double recovery. *See Shell Oil*, 358 F.3d at 691. That leaves a total of $1,529,871.09. The Court allocates this 75% to Joslyn and 25% to Valbruna. While this determination reflects careful consideration of all of the above factors, the Court particularly emphasizes Joslyn's status as the sole polluting party to this action and its blatant avoidance of liability and refusal to assist with some cleanup despite knowing it was responsible for contaminating the Site for an extensive period. It also notes the discounted price Valbruna paid for the property and Valbruna's voluntary assumption of some risk in association with the transaction, while recognizing the purpose of CERCLA in spurring environmental cleanup of contaminated sites. *See NCR*, 768 F.3d at 689. Given the Court's previous entry of a declaratory judgment in favor of Valbruna under CERCLA [DE 124], this allocation will apply prospectively, as well as to the past costs discussed herein. *See PMC*, 151 F.3d at 616 (holding that such an "all-at-once determination" is proper as it economizes on judicial time). Joslyn shall

---

[9] Relatedly, Joslyn argued at trial that Valbruna should have sued Slater to access its insurance policies. However, Slater's Chapter 11 bankruptcy terminated in 2006, before Valbruna received the 2007 letter from the EPA. Further, the evidence at trial was insufficient to support a finding that Valbruna had a viable cause of action against the bankrupt Slater such that if Slater lost, its insurance would be forced to pay the judgment.

thus be liable to Valbruna under § 113(g)(2) for 75% of all future costs incurred to clean up the Site that are necessary and consistent with the National Contingency Plan. *See NutraSweet*, 227 F.3d at 791 (costs incurred must be necessary and consistent with the National Contingency Plan). However, the Court notes that upon a timely petition of either party it may revisit this allocation should unforeseen circumstances render adherence to it inequitable. *See PMC*, 151 F.3d at 616 (noting that cooperativeness in the actual clean-up is a relevant equitable factor not readily evaluated until clean-up is complete; and thus, the court can revisit the allocation determination should that factor or other unforeseen circumstances make the original determination inequitable). Since the parties have not distinguished the roles of the various Joslyn entities, this award shall apply jointly and severally to Joslyn Manufacturing Company, Joslyn Corporation, and Joslyn Manufacturing Company, LLC. This Order does not contemplate interest or attorneys' fees, which the parties have agreed to resolve at a future proceeding. The Court will contact counsel in the near future to set a telephonic status conference to address the resolution of these remaining issues.

    SO ORDERED.

    ENTERED: January 16, 2018

                                  /s/ JON E. DEGUILIO
                              Judge
                              United States District Court